[Cite as *State v. Taylor*, 2016-Ohio-7953.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 28091 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| KEVIN TAYLOR | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 14 11 3501 (L) |

DECISION AND JOURNAL ENTRY

Dated: November 30, 2016

MOORE, Presiding Judge.

{¶1} Defendant-Appellant, Kevin Taylor, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of November 15, 2014, multiple law enforcement agencies conducted a raid at a home in Akron. The raid occurred because the police suspected that a large scale, illegal dogfight was set to occur on the property. As a result of the raid, the police arrested more than 45 individuals in connection with dogfighting. Mr. Taylor was one of the individuals whom the police arrested. At the time of his arrest, he had $40 in cash on his person.

{¶3} A grand jury indicted Mr. Taylor on one count of dogfighting, in violation of R.C. 959.16(A)(5), as well as a criminal forfeiture specification for the $40 in cash. Mr. Taylor waived his right to a jury and went to trial along with two of his co-defendants. At the conclusion of trial, the court found Mr. Taylor guilty of dogfighting, but not guilty of his

forfeiture specification. Mr. Taylor then filed a motion for new trial, and the court denied his motion. The court sentenced him to a suspended sentence and three years of community control.

{¶4} Mr. Taylor now appeals from his conviction and raises four assignments of error for our review. For ease of analysis, we consolidate and rearrange several of the assignments of error.

II.

**ASSIGNMENT OF ERROR IV**

THE TRIAL COURT ABUSED ITS DISCRETION BY NOT GRANTING [MR.] TAYLOR A NEW TRIAL.

{¶5} In his fourth assignment of error, Mr. Taylor argues that the trial court erred when it denied his motion for a new trial. He argues that an irregularity in the proceedings occurred and he was denied a fair trial when the trial court "refused to inform the parties of the elements of the crime Dogfighting until after all witnesses had testified."

{¶6} "The decision to grant a motion for a new trial is within the sound discretion of the trial court." *State v. Covender*, 9th Dist. Lorain No. 09CA009637, 2010-Ohio-2808, ¶ 12. Accordingly, this Court reviews a trial court's ruling on a motion for new trial under an abuse of discretion standard of review. *Id. Accord State v. Gilliam*, 9th Dist. Lorain No. 14CA010558, 2014-Ohio-5476, ¶ 8. An abuse of discretion implies that the court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶7} "Crim.R. 33(A) allows a defendant to move for a new trial when his substantial rights have been materially affected." *Gilliam* at ¶ 9. The rule sets forth several bases upon which a defendant may seek a new trial, including:

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

* * *

(4) That the verdict is not sustained by sufficient evidence or is contrary to law * * *; [and]

(5) Error of law occurring at the trial * * *.

Crim.R. 33(A)(1), (4), (5). "A new trial may be granted under Crim. R. 33(A)(1) only when there is an irregularity, and when the record demonstrates that defendant was prejudiced thereby or denied a fair trial." *State v. Mason*, 9th Dist. Summit No. 11182, 1983 WL 3913, *2 (Nov. 9, 1983).

{¶8}   The dogfighting statute provides, in relevant part, that "[n]o person shall knowingly * * * [p]ay money or give anything of value in exchange for admission to or be present at a dogfight[.]" R.C. 959.16(A)(5). At trial, the parties had different interpretations of the statute. The State read the statute in the disjunctive and argued that it could convict Mr. Taylor strictly for knowingly being present at a dogfight. Meanwhile, Mr. Taylor read the statute in the conjunctive and argued that the State had to prove that he knowingly (1) paid money or gave something of value, and (2) did so to be present at a dogfight. The trial court repeatedly heard arguments from both sides, but did not resolve the statutory interpretation issue until after the State rested its case. The court ultimately agreed with Mr. Taylor's interpretation and read the statute in the conjunctive. Nevertheless, it ultimately found Mr. Taylor guilty because it determined that he had knowingly paid money to be present at a dogfight.

{¶9}   Mr. Taylor argues that the court's decision to delay its ruling until the end of trial materially affected his substantial rights. He argues that an irregularity in the proceedings occurred because his counsel did not know which elements the State needed to prove in order to secure a conviction against him. *See* Crim.R. 33(A)(1). According to Mr. Taylor, without an

earlier ruling from the court, his counsel could not advise him "on whether or not it made sense to testify in his own behalf or what other evidence to introduce."

{¶10} Before we turn to Mr. Taylor's argument that he was prejudiced by the delay in the trial court's ruling, we first must consider the ruling itself. Mr. Taylor also argues that his conviction is based on insufficient evidence and is against the manifest weight of the evidence. Accordingly, for purposes of both this assignment of error and Mr. Taylor's later assignments of error, we must determine whether the trial court correctly interpreted R.C. 959.16(A)(5).

{¶11} "[W]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom." *State v. Knoble*, 9th Dist. Lorain No. 08CA009359, 2008-Ohio-5004, ¶ 12, quoting *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, ¶ 14. "If it is ambiguous, we must then interpret the statute to determine the General Assembly's intent. If it is not ambiguous, then we need not interpret it; we must simply apply it." *State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969, ¶ 13.

> In interpreting a statute, a court's paramount concern is legislative intent. To determine this intent, we read words and phrases in context and construe them in accordance with the rules of grammar and common usage. Additionally, if a statute is ambiguous, the legislative intent may be reflected in the objective sought by the legislature, the circumstances of the statute's enactment, or the statute's legislative history.

(Internal citations omitted.) *State v. Massien*, 9th Dist. Summit No. 24369, 2009-Ohio-1521, ¶ 5.

{¶12} As previously noted, R.C. 959.16(A)(5) provides that "[n]o person shall knowingly * * * [p]ay money or give anything of value in exchange for admission to or be present at a dogfight[.]" The phrase "or be present at a dogfight" can be read in one of two ways. The phrase can be read as an independent clause, giving rise to a charge separate and apart from the earlier clause regarding the payment of money or the giving of value. Conversely, it can be

read in conjunction with the remainder of the statute, requiring the payment of money or value for either admission to or to be present at a dogfight. Because the plain language of the statute is susceptible to more than one interpretation, we must conclude that it is ambiguous. *See State v. Jordan*, 89 Ohio St.3d 488, 492 (2000) ("Ambiguity exists if the language is susceptible of more than one reasonable interpretation."). Accordingly, in interpreting the statute, we must consider the intent of the General Assembly. *See Hairston* at ¶ 13; *Massien* at ¶ 5.

{¶13} In 1980, the General Assembly enacted R.C. 959.16 for the purpose of increasing the penalties for dogfighting. 1980 Am.Sub.S.B. No. 233. Previously, dogfighting was included in the general animal fighting statute that prohibited any person from knowingly partaking in dogfighting, cockfighting, bearbaiting, or pitting an animal against another. *See* former R.C. 959.15. At that time, the general animal fighting statute provided: "Any person who knowingly purchases a ticket of admission to such place, or is present threat, or witnesses such spectacle, is an aider and abettor." Former R.C. 959.15. Accordingly, before the creation of R.C. 959.16, the Revised Code expressly prohibited a person from knowingly being present at a dogfight. *See* former R.C. 959.15.

{¶14} In enacting R.C. 959.16 for the purpose of increasing the penalties for dogfighting, the General Assembly created subdivision (A)(5). At the time of its enactment, the subdivision prohibited any person from knowingly "purchas[ing] a ticket of admission to or be[ing] present at a dogfight[.]" *See* former R.C. 959.16(A)(5), 1980 Am.Sub.S.B. No. 233. The subdivision remained unchanged until 2008, at which point the General Assembly enacted several new pieces of legislation targeted at dogfighting. *See* 2008 Am.Sub.H.B. No. 71. In doing so, the General Assembly also amended R.C. 959.16(A)(5). *See id.* The amendment eliminated the "[p]urchase a ticket of" language and replaced it with the "[p]ay money or give

anything else of value in exchange for" language that appears in the current version of the statute. *See id.* In the final bill analysis for Substitute House Bill Number 71, the Legislative Service Commission wrote:

> Ongoing law prohibits a person from committing the offense of dogfighting, which includes promoting, engaging in, or being employed at dogfighting; selling, purchasing, possessing, or training a dog for dogfighting; using, training, or possessing a dog for seizing, detaining, or maltreating a domestic animal; or witnessing a dogfight if it is presented as a public spectacle. In addition, under law revised in part by the act, the offense of dogfighting also includes receiving money for the admission of another person to a place kept for dogfighting. The act changes that provision to specify that the offense includes receiving money or anything else of value for the admission of another person to a dogfighting event or a place kept for dogfighting. Former law also specified that the offense of dogfighting included purchasing a ticket of admission to a dogfight. The act instead specifies that the offense includes paying money or giving anything else of value in exchange for admission to a dogfight. *Finally, the act retains language specifying that the offense of dogfighting includes being present at a dogfight. (Sec. 959.16(A).)*

(Emphasis added.) Bill Analysis, 127th Leg., 2008 Am.Sub.H.B. No. 71.

{¶15} In light of all the foregoing, we must conclude that, in enacting and amending R.C. 959.16(A)(5), the General Assembly intended to criminalize two distinct acts: (1) knowingly paying money or giving something of value for admission to a dog fight, and (2) knowingly being present at a dogfight. Before R.C. 959.16's enactment, it was a crime to knowingly be present at a dogfight. *See* former R.C. 959.15. Further, the impetus for the statute's enactment was to increase penalties for dogfighting. *See* 1980 Am.Sub.S.B. No. 233. Construing the newly enacted statute to eliminate what was formerly a criminal act would be contrary to the stated purpose for its enactment. Moreover, in analyzing the amendments to the statute in 2008, the Legislative Service Commission specifically noted that the act retained the language "specifying that the offense of dogfighting includes being present at a dogfight." Bill Analysis, 127th Leg., 2008 Am.Sub.H.B. No. 71. It is reasonable to conclude that the General

Assembly intended R.C. 959.16(A)(5) to criminalize both the act of knowingly being present at a dogfight and the act of paying money or giving value to attend a dogfight.

{¶16} The trial court here erred in its interpretation of R.C. 959.16(A)(5). To secure a conviction under that subdivision, the State only had to prove that Mr. Taylor was knowingly present at a dogfight. It was unnecessary for the State to also prove that Mr. Taylor paid money or gave something of value to be present at the fight. The question is how the court's error bears upon Mr. Taylor's argument that he was denied a fair trial.

{¶17} Mr. Taylor's argument is not that the trial court erred in its interpretation R.C. 959.16(A)(5). To the contrary, the court erred to the benefit of Mr. Taylor by erroneously adopting his interpretation of the statute. Moreover, Mr. Taylor has not argued that R.C. 959.16(A)(5) is unconstitutionally vague. His argument is that the trial court denied him his right to a fair trial by waiting until the end of trial to announce its decision on the statutory interpretation issue. He asserts that the delay prevented his counsel from advising him whether he should testify or introduce "other evidence."

{¶18} Notably, Mr. Taylor never filed any pretrial motion(s) with the trial court that might have caused it to examine R.C. 959.16(A)(5) in advance of trial (e.g., a motion to dismiss because the statute is unconstitutionally vague). There was a significant amount of discussion about the statute at trial, but much of that discussion was prompted by the State, not defense counsel. Mr. Taylor has not explained why the trial court was obligated to issue a preliminary ruling, interpreting R.C. 959.16(A)(5), without there being a motion from him before it. *See* App.R. 16(A)(7). Both the State and Mr. Taylor may have benefited from an earlier statutory interpretation ruling, given the complete lack of case law in Ohio either interpreting or applying R.C. 959.16(A)(5). To prevail on a motion for a new trial, however, Mr. Taylor had to show that

the absence of an earlier ruling materially affected his substantial rights. *See Gilliam*, 2014-Ohio-5476, ¶ 9. The record reflects that he failed to do so.

{¶19} If a trial court neglects to instruct a jury on an essential element of a crime, its error "is subject to harmless-error analysis * * *." *Neder v. United States*, 527 U.S. 1, 15 (1999). The verdict will stand if, after "a thorough examination of the record," a reviewing court can conclude beyond a reasonable doubt that the verdict would have been the same absent the court's error. *Id.* at 19. *Accord State v. Page*, 9th Dist. Summit No. 23420, 2007-Ohio-2895, ¶ 21-26. Here, there was no jury, and the trial court did not fail to consider an essential element of R.C. 959.16(A)(5) in reaching its decision. To the contrary, the court required the State to prove *more* than the statute required. *Compare State v. Kerrigan*, 168 Ohio App.3d 455, 2006-Ohio-4279, ¶ 60 (2d.Dist.) (conviction overturned where jury instructions "misstat[ed] an element of the offense in a manner that [made] it easier to find the defendant guilty"). It convicted Mr. Taylor because it determined that he knowingly (1) paid money or gave something of value, and (2) did so to be present at a dogfight. As previously explained, the State need only have proved that Mr. Taylor was knowingly present at a dogfight.

{¶20} The court announced its ruling at the close of the State's case, but before the defense rested. At that point, Mr. Taylor still could have chosen to testify in his own defense. He did not, however, object to the court's ruling, request a recess, or seek a continuance. Further, he has not identified what "other evidence" his counsel might have introduced, had he received the court's ruling at an earlier time. *See* App.R. 16(A)(7). The trial court ultimately required the State to prove an additional, superfluous element. Even assuming that an irregularity in the proceedings occurred here, Mr. Taylor has not shown how it materially affected his substantial rights. *See Gilliam*, 2014-Ohio-5476, at ¶ 9. As discussed below, the

record contains evidence from which a rational trier of fact could have concluded that Mr. Taylor was knowingly present at a dog fight. Thus, his conviction itself comports with due process. *See State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 36 ("Due process requires that the state establish beyond a reasonable doubt every fact necessary to constitute the crime charged."). *Compare Kerrigan* at ¶ 60. Because Mr. Taylor has not shown that he was denied a fair trial, we cannot conclude that the court abused its discretion by denying his motion. Mr. Taylor's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A FINDING OF GUILT FOR DOG FIGHTING PURSUANT TO OHIO REVISED CODE §959.16(A)(5).

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY NOT GRANTING DEFENSE COUNSEL'S CRIMINAL RULE 29 MOTION.

{¶21} In his first assignment of error, Mr. Taylor argues that his conviction for dogfighting is based on insufficient evidence. In his third assignment of error, he argues that the court erred by denying his Crim.R. 29 motion for acquittal. We disagree with both propositions.

{¶22} Pursuant to Crim.R. 29(A), a defendant is entitled to a judgment of acquittal "if the evidence is insufficient to sustain a conviction * * *." "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Archer*, 9th Dist. Summit No. 26848, 2014-Ohio-1207, ¶ 10, quoting *State v. Slevin*, 9th Dist. Summit No. 25956, 2012-Ohio-2043, ¶ 15. The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶23} As it pertains to this case, R.C. 959.16(A)(5) provides that "[n]o person shall knowingly * * * be present at a dogfight[.]" "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Former R.C. 2901.22(B). Whoever commits the foregoing offense is guilty of dogfighting, a fourth-degree felony. R.C. 959.99(H).

{¶24} Captain Clark Westfall testified that he helped organize a raid at a home in Akron, where the police suspected that the owner was conducting a dogfighting operation. As part of its case-in-chief, the State introduced several pictures of the target residence, two of which are aerial map views. The pictures show that the home is located at the end of a dead-end street and has a sizeable backyard that abuts a noise barrier for the freeway. The backyard contains a detached garage as well as a freestanding trailer. The front of the home faces west, and entire backyard is enclosed by a fence. The fence joins to the house on the house's north and south sides such that the fence traverses the driveway for the residence. The portion of the fence that traverses the driveway and connects with the south side of the house is a large, retractable gate.

{¶25} Captain Westfall testified that multiple law enforcement agencies took positions around the target residence before the start of the raid and watched as numerous people entered the fenced-in backyard. He testified that the retractable gate eventually closed and, at approximately 10:41 p.m., he signaled for the raid to commence. The police used an armored

vehicle to break through the gate across the driveway, and, according to Captain Westfall, "absolute chao[s]" ensued. He testified that people were "running everywhere, throwing contraband, [and] * * * trying to breach the fencing." A total of 52 law enforcement officers ultimately responded to the scene that evening, and 47 individuals were arrested.

{¶26} Detective Brian Boss testified that he acted as the lead operator for the Akron SWAT team when the raid ensued. He stated that his team was the first to breach the backyard after the gate was compromised and that he immediately rounded the southeast corner of the house. In the area between the north side of the detached garage and the north fence line, he then observed "30 to 40 people and two men taunting two pitbulls." He specified that the two men were holding the dogs on their leads, facing one another and "inciting them to fight." Meanwhile, the crowd was gathered around watching the process. He testified that, as soon as the crowd realized the police where there, everyone scattered. He estimated that, apart from the crowd he saw outside, the police arrested another 8 to 10 individuals in the detached garage on the property.

{¶27} Officer Delvin Pickett, a member of the crime scene unit, testified that he took a video recording of the scene at the property after the raid occurred. The video recording documents numerous items related to dogfighting. Inside the detached garage at the property, Officer Pickett found a large, square, freestanding ring that looks to have been constructed from wood and other materials. The inside flooring of the ring had several long pieces of duct tape arranged in lines. Officer Pickett stated that he believed the lines were used as starting marks for the dogs placed inside the ring. He testified that both the lines of duct tape and the inside walls of the ring were covered in blood. Officer Pickett also found inside the garage buckets of water, sponges, and bloodied break sticks, which he testified are used to pry open a dog's mouth.

{¶28} Apart from the detached garage, Officer Pickett also documented the inside of the freestanding trailer at the southeast corner of the backyard and a separate, fenced area that he found there. The trailer contained more buckets of water and sponges, a filthy shower area, and weighing scales. In the separate, fenced area, Officer Pickett found individual, enclosed cages for dogs, kennels, chains, and bowls. At the time that he recorded the scene, at least one dog was still confined in one of the kennels in the fenced-in area.

{¶29} In addition to filming the contents of the structures on the property, Officer Pickett also documented the numerous vehicles that were on scene when the raid commenced. Several of the vehicles were parked inside the enclosed backyard and additional vehicles were parked at a vacant lot that was located to the north of the target residence. Officer Pickett testified that he was able to observe kennels in a number of the vehicles that he recorded, including the vehicles parked in the backyard. There was testimony that nine of the individuals the police arrested that evening traveled from out of state.

{¶30} Officer Tim Harland testified that he is a senior officer for the Summit County Humane Society and that he was present at the target residence to secure the dogs on scene and provide them any necessary medical treatment. He testified that he ultimately collected eight dogs from the property that evening, all of which were either pit bulls or pit bull mixes. According to Officer Harland, the fact that all the dogs were pit bulls or a mix thereof was significant to him because that is the breed that people typically select for dogfighting. Of the eight dogs collected, two of them had actively bleeding puncture wounds and "had obviously been recently fought." Officer Harland testified that another dog had to be euthanized for safety reasons because he was vicious.

{¶31} Detective Mark Hockman testified that he was a member of the Akron SWAT team that raided the property that evening. Following the raid, any individuals whom the police arrested were searched and any money they possessed was confiscated. Yet, Detective Hockman testified that the police also found significant sums of money on the ground. He stated that there was money on the ground at the threshold of the attached garage and also a bundle of just under $7,000 on the ground near the northwest corner of the house. The police ultimately recovered over $52,000 in cash from the property that evening. Detective Hockman confirmed that Mr. Taylor had $40 on his person when he was arrested. He testified that he personally completed Mr. Taylor's booking ticket that evening. It is not clear from the record where Mr. Taylor was located at the exact time of the raid or his arrest. Detective Hockman did testify, however, that he and Mr. Taylor "were together there at [the target residence], in that garage, when [he] did that booking slip, [Mr. Taylor] was there."

{¶32} The State also called as witnesses, Alvin Banks, the owner of the property at issue, and Maurice Wynn, Jr., another individual who was arrested for dogfighting that evening. Mr. Banks' testimony was limited to him asserting his Fifth Amendment rights. Meanwhile, Mr. Wynn testified that he had accepted the State's offer for a reduction of his charge in exchange for his testimony. Mr. Wynn stated that he came to the target residence on the evening of the raid because Mr. Banks had told him there would be a dogfight. He also testified that he paid Mr. Banks $75, which he understood to be an admission charge to see the fight. According to Mr. Wynn, he never observed anyone else pay an admission fee. Mr. Wynn grudgingly admitted that he saw several other people in the yard that evening and that a few people threw money on the ground when the police arrived. He also acknowledged that he and a group of people were

watching two dogs fight before the police arrived, but denied that anyone was taunting the dogs. He testified that the dogs had broken loose and were simply fighting one another.

{¶33} As part of its case-in-chief, the State also introduced a jail call that Mr. Taylor placed while being held at the Summit County Jail. In the call, Mr. Taylor informs the call recipient that he has been arrested for dogfighting. He then tells the call recipient that he "[was not] even in the building," but "was outside the building."

{¶34} Mr. Taylor argues that his conviction is based on insufficient evidence because there was no evidence that he was knowingly present that evening to see or bet on a dogfight. He notes that there was limited testimony that pertained directly to him and that, when he was arrested, he only had $40 in cash. Given the fact that the cost of admission to the dogfight was $75 and the fact that other people there that evening had brought with them significant sums of money, Mr. Taylor argues that the evidence does not support the conclusion that he was present at the home for anything other than a party.

{¶35} Viewing all of the evidence in a light most favorable to the State, we must conclude that the State set forth evidence from which a rational trier of fact could have found that Mr. Taylor was knowingly present at a dogfight. Due to the chaos that ensued when the police conducted the raid here, there was no testimony as to Mr. Taylor's exact location either at the time of the raid or at the time of his arrest. Yet, there is no dispute that he was present at the scene. Mr. Taylor himself stated that he was "outside the building" where the dogfighting was occurring when the police arrived. Moreover, there was testimony that, when the police arrived, a group of 30-40 individuals were watching two men taunt two dogs and incite them to fight. There was testimony that there were eight dogs on the property that evening and that two of the dogs had actively bleeding puncture wounds consistent with having been fought recently.

Although Mr. Taylor was only in possession of $40 at the time of his arrest, there was testimony that numerous individuals dropped their money on the ground when they realized the police had arrived. The trier of fact reasonably could have inferred either that: (1) Mr. Taylor was one of the individuals who dropped money on the ground, or (2) Mr. Taylor could surmise from the presence of the dogs, the behavior of the crowd, and the large quantities of money the crowd had in hand that he was present at a dogfight rather than simply a party. *See* former R.C. 2901.22(B) (defining the circumstances in which a person acts "knowingly"). Mr. Taylor has not shown that his dogfighting conviction is based on insufficient evidence. Consequently, his first and third assignments of error are overruled.

### ASSIGNMENT OF ERROR II

THE VERDICT OF GUILTY FOR DOG FIGHTING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶36} In his second assignment of error, Mr. Taylor argues that his conviction for dogfighting is against the manifest weight of the evidence. We do not agree.

{¶37} When a defendant asserts that his conviction is against the manifest weight of the evidence:

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶38} Mr. Taylor did not present any evidence in his own defense. He argues that the court lost its way in convicting him because he did not have a dog with him at the target residence, he was not linked to any of the vehicles found there, and he did not even have enough

money on his person to pay the $75 admission fee for the dogfight. According to Mr. Taylor, the court convicted him "without requiring any evidence linking [him] to the dog fighting * * *."

{¶39} Mr. Taylor's manifest weight argument essentially mirrors his sufficiency argument. *See State v. Hodges*, 9th Dist. Medina No. 15CA0056-M, 2016-Ohio-5461, ¶ 16. "[S]ufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Mr. Taylor has not challenged any of the evidence the State set forth as "unreliable or lacking credibility." *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 16. This Court will not develop a manifest weight argument on his behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32. We have already determined that his conviction is based on sufficient evidence, and Mr. Taylor has not shown that this is the exceptional case where the trier of fact lost its way in convicting him. *See id.* Thus, his second assignment of error is overruled.

III.

{¶40} Mr. Taylor's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT


WHITMORE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

JAMES W. ARMSTRONG, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.