[Cite as *State v. Carrion*, 2017-Ohio-7043.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 28194 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| STEPHEN CARRION | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014-11-3501 (OO) |

DECISION AND JOURNAL ENTRY

Dated: August 2, 2017

CARR, Judge.

{¶1} Defendant-Appellant, Stephen Carrion, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of November 15, 2014, multiple law enforcement agencies conducted a raid at a home in Akron. The raid occurred because the police suspected that a large scale, illegal dogfight was set to occur on the property. As a result of the raid, the police arrested more than 45 individuals in connection with dogfighting. Carrion was one of the individuals whom the police arrested. At the time of his arrest, he had over $2,500 in cash on his person.

{¶3} A grand jury indicted Carrion on one count of dogfighting, in violation of R.C. 959.16(A)(5), as well as a criminal forfeiture specification for the money he had with him at the time of his arrest. A jury trial was held, and the jury found Carrion guilty of dogfighting. At the

State's request, the trial court dismissed the forfeiture specification linked to that count. The court sentenced Carrion to two years of community control.

{¶4} Carrion now appeals from his conviction and raises two assignments of error for our review. For ease of analysis, we reorder the assignments of error.

II.

**ASSIGNMENT OF ERROR II**

APPELLANT'S CONVICTION WAS BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW, AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} In his second assignment of error, Carrion argues that his dogfighting conviction is based on insufficient evidence and is against the manifest weight of the evidence. We disagree.

{¶6} A review of the sufficiency of the State's evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. *State v. Gulley*, 9th Dist. Summit No. 19600, 2000 WL 277908, *1 (Mar. 15, 2000). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶7}    R.C. 959.16(A)(5) provides that "[n]o person shall knowingly * * * [p]ay money or give anything else of value in exchange for admission to or be present at a dogfight."  This Court recently examined the foregoing statute and found it to be ambiguous.  *See State v. Taylor*, 9th Dist. Summit No. 28091, 2016-Ohio-7953.  We, therefore, conducted a statutory analysis and determined that R.C. 959.16(A)(5)'s legislative history supports a disjunctive reading of the statute.  *Id.* at ¶ 12-15.  We held that, to support a conviction under R.C. 959.16(A)(5), the State may prove either that a person (1) knowingly paid money or gave something of value for admission to a dogfight, or (2) knowingly was present at a dogfight.  *Id.* at ¶ 15.  "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."  Former R.C. 2901.22(B).

{¶8}    Captain Clark Westfall testified that he helped organize a raid at a home in Akron, where the police suspected that the owner was conducting a dogfighting operation.  As part of its case-in-chief, the State introduced pictures of the target residence, several of which are aerial map views.  The pictures show that the home is located at the end of a dead-end street and has a sizeable backyard that abuts a noise barrier for the freeway.  The backyard contains a detached garage as well as a freestanding trailer.  The front of the home faces west, and the entire backyard is enclosed by a fence.  The fence joins to the house on the house's north and south sides such that the fence traverses the driveway for the residence.  The portion of the fence that traverses the driveway and connects with the south side of the house is a large, retractable gate.

{¶9}    Captain Westfall testified that, the evening of the raid, multiple law enforcement agencies took positions around the target residence and conducted surveillance as people entered the fenced-in backyard.  Meanwhile, another group of officers waited at a nearby facility with an

armored vehicle. Once the gate to the target residence closed and the police did not observe any additional vehicle or pedestrian traffic, Captain Westfall signaled for the armored vehicle. He testified that the police secured the property on all sides before the armored vehicle arrived. The police then followed behind the armored vehicle and initiated the raid when it breached the retractable gate surrounding the property. Captain Westfall indicated that the scene became chaotic following the breach because the individuals in the yard tried to run. He specified that he saw "numerous people running out of the garage, * * * throwing money and contraband and just trying to find a way to escape." He testified that the raid utilized a total of 52 law enforcement officers due to the size of the scene and the number of individuals involved.

{¶10} On the evening of the raid, Detective Mark Hockman was tasked with maintaining surveillance from a public walkway that ran along the southern edge of the target residence. From his position, he could observe portions of the backyard as well as the street leading to the property. According to Detective Hockman, the police were led to believe that three dogfights would occur at the property that evening and that the fights would begin when the retractable gate closed. Eventually, the gate closed, and Detective Hockman watched until the armored vehicle arrived to breach the gate. He testified that, in the interim, he saw the individuals gathered in the backyard "making their way into the garage." Although Detective Hockman could not see the north side of the garage from his position, he knew there was a man door there. He testified that the individuals in the yard began "single filing" in the direction of the man door, so he presumed they were entering the garage. He testified that, after the group moved into the garage, he was not able to see any other individuals in the backyard. He continued to watch and, shortly before the armored vehicle arrived, he observed individuals leaving the garage area. Detective Hockman confirmed that the crowd he saw remained in the

yard and no one else entered the property after the retractable gate closed. He described the property as a "compound." He specified that it was entirely surrounded by six-foot high privacy fencing and bordered on the east side by a noise barrier for the freeway.

{¶11} Detective Hockman testified that, as soon as the armored vehicle breached the retractable gate, people scattered and went "running all about in all different directions." He quickly went to assist other officers in their attempt to detain the fleeing individuals and, following the chaos, further aided in the investigation on the property. He testified that the police ultimately seized over $52,000 that evening and over $2,500 of that amount came from Carrion, who was arrested at the scene.

{¶12} Detective Hockman stated that he had specialized knowledge and training regarding dogfighting and that the event the police interrupted that evening was highly organized and would have had to have been "planned months in advance." He described dogfights as "clandestine" and testified that it is impossible to attend one "unless you know somebody or have been * * * recommended." He stated that the events are funded through spectators, who pay to watch the matches and also gamble on their outcomes.

{¶13} Detective Brian Boss testified that he acted as the lead operator for the Akron SWAT team when the raid ensued. He stated that his team was the first to breach the backyard after the gate was compromised and that he immediately rounded the southeast corner of the house. In the area between the north side of the detached garage and the north fence line, he briefly observed approximately 40 people standing near the garage watching two men taunt two pit bulls on separate leashes. The crowd then scattered, and Detective Boss and his team gave chase. He testified that a portion of the fence surrounding the property actually collapsed from the weight of the individuals attempting to escape and the officers apprehending them.

{¶14} Officer Delvin Pickett, a member of the crime scene unit, testified that he took a video recording of the scene at the property after the raid occurred. The video recording documents numerous items related to dogfighting. Inside the detached garage at the property, Officer Pickett found a large, square, freestanding ring that looks to have been constructed from wood and other materials. The inside flooring of the ring was carpeted and had several long pieces of duct tape arranged in lines. Officer Pickett stated that both the lines of duct tape and the inside walls of the ring were covered in blood. He also found inside the garage buckets of water, sponges, and bloodied break sticks. Officer Pickett agreed that there was enough room between the ring and the garage walls to accommodate several rows of people. During his testimony, Detective Hockman confirmed that the garage could have accommodated the number of people arrested that evening.

{¶15} Apart from the detached garage, Officer Pickett also documented the inside of the freestanding trailer at the southeast corner of the backyard and a separate, fenced area that he found there. The trailer contained more buckets of water and sponges, a filthy shower area, and weighing scales. In the separate, fenced area, Officer Pickett found individual, enclosed cages for dogs, kennels, chains, and bowls.

{¶16} In addition to filming the contents of the structures on the property, Officer Pickett also documented the numerous vehicles that were on scene when the raid commenced. Several of the vehicles were parked inside the enclosed backyard and additional vehicles were parked at a vacant lot that was located to the north of the target residence. Officer Pickett testified that a number of the vehicles had out of state license plates. He further testified that he was able to observe kennels in a number of the vehicles, including the vehicles parked in the backyard. At least one of the kennels had a dog inside of it.

{¶17} Officer Tim Harland testified that he works for the Summit County Humane Society and was present at the target residence to secure the dogs on scene and provide them any necessary medical treatment. He testified that he ultimately collected eight dogs from the property that evening, all of which were either pit bulls or pit bull mixes. Of the eight dogs collected, two were severely injured and required hospitalization. Officer Harland specified that the two dogs had fresh puncture wounds that appeared to be consistent with dog bite wounds. Based on his training and experience, Officer Harland opined that the two injured dogs had received their injuries within an hour or two of his examination.

{¶18} The State also presented the testimony of three men who were arrested the evening of the raid and agreed to testify pursuant to a plea agreement. The first man testified that Alvin Banks, the owner of the target residence, invited him to his house that evening to watch a dogfight. He testified that Banks charged him money to watch the fight, and he saw one fight in the garage before the raid took place. He agreed that there were other people in the garage with him when the dogfight took place.

{¶19} The second man testified that he went to the target residence on the evening of the raid for a party and to see a dogfight. He stated that he had known Banks for about 30 years and they shared a mutual interest in pit bulls and dogfighting. On the evening of the raid, he paid Banks for admission to the dogfight that took place in the garage. He testified that he saw Banks collecting money from other people as well and that the garage "was packed" for the fight that took place before the raid.

{¶20} The third man testified that he was familiar with Banks, knew he hosted dogfights, and went to the target residence that evening to watch the fights. He stated that, when

he arrived, he paid Banks money for admission to the fights. He stated that he watched one fight in the garage before the police arrived.

{¶21} Carrion argues that his dogfighting conviction is based on insufficient evidence because there was no evidence that he ever paid money to see a dogfight, entered the garage to watch a dogfight, or knew that a dogfight was taking place at the property that evening. He argues that his mere presence at the property was insufficient to sustain a conviction because he could have been there for reasons other than the dogfight; such as to enjoy the party or a basketball game that was being televised.

{¶22} As previously noted, this Court has interpreted R.C. 959.16(A)(5) as requiring the State to prove *either* that a person (1) knowingly paid money or gave something of value for admission to a dogfight, *or* (2) knowingly was present at a dogfight. *Taylor*, 2016-Ohio-7953, at ¶ 15. Accordingly, the State was not required to prove that Carrion paid money or gave something of value for admission to the dogfight(s) at the target residence. His conviction can stand so long as the State set forth sufficient evidence that he was knowingly present at a dogfight. Viewing all the evidence in a light most favorable to the State, we must conclude that the State satisfied its burden of production on that issue.

{¶23} There was limited testimony at trial that specifically pertained to Carrion, but there is no dispute that he was arrested during the raid with more than $2,500 in cash on his person. Detective Hockman opined, based on his training and experience, that it would have been impossible for someone to be present that evening without receiving a personal invitation or being recommended to attend the dogfight. He noted that dogfights are "clandestine" and estimated that the event here had been planned well in advance. He also noted that spectators frequently gamble on the outcomes of dogfights. There was testimony that the property here was

entirely surrounded by a six-foot high security fence and a large, retractable gate that was secured when the dogfights started. There also was testimony that, from the time the gate closed until it was breached, the crowd in the yard appeared to enter the detached garage where the dogfight occurred. Three different individuals stated that they watched a dogfight in the garage, and one of them specified that the garage "was packed" when the fight occurred. Detective Boss also saw a large crowd watching two men taunt two pit bulls when he entered the property behind the armored vehicle. There was testimony that the police collected approximately $52,000 that evening and that they found significant sums of money on the ground where it had been thrown when the raid commenced. "Given the presence of the dogs, the behavior of the crowd, the clandestine nature of the event, and the large quantities of money that the crowd had on hand, a rational trier of fact could have concluded that [Carrion] was knowingly present at a dogfight that evening." *State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169, ¶ 22. *See also* former R.C. 2901.22(B) (defining the circumstances in which a person acts "knowingly"). As such, he has not shown that his dogfighting conviction is based on insufficient evidence.

{¶24} In his brief, Carrion also cites the manifest weight standard of review and asserts that "[u]nder either the sufficiency of evidence or the manifest weight standards, the evidence against [him] fell far short of supporting a conviction." He has not, however, challenged any of the evidence the State set forth as "unreliable or lacking credibility." *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 16. "[S]ufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. This Court will not develop a manifest weight argument on Carrion's behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32. Carrion has not

shown that this is the exceptional case where the trier of fact lost its way in convicting him. *See id.* at ¶ 33. Thus, second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S PROPOSED JURY INSTRUCTIONS REGARDING MERE PRESENCE AT A CRIME SCENE, THE STACKING OF INFERENCES, AND THE CORRECT CONSTRUCTION OF THE DOGFIGHTING STATUTE, R.C. 959.16(A)(5).

{¶25} In his first assignment of error, Carrion argues that the trial court erred when it refused to instruct the jurors that they could not (1) convict him based upon his mere presence at a dogfight, or (2) engage in inference-stacking. For the reasons outlined below, we reject Carrion's first assignment of error.

{¶26} "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus.

> Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction. An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion.

*State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "'A trial court's failure to give a proposed jury instruction is only reversible error if the defendant demonstrates that the trial court abused its discretion, and that the defendant was prejudiced by the court's refusal to give the proposed instruction.'" *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45, quoting *Azbell v. Newark Grp., Inc.*, 5th Dist. Fairfield No. 07 CA 00001, 2008-Ohio-2639, ¶ 52.

{¶27} The trial court here instructed the jury based on the language of R.C. 959.16(A)(5). That is, the court instructed the jury that, before finding Carrion guilty, the jury

had to find beyond a reasonable doubt that he "knowingly paid money or gave anything else of value in exchange for admission to or to be present at a dog fight." The court further instructed:

> Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of [Carrion] an awareness of the probability that he paid money or gave anything else of value in exchange for admission to or to be present at a dog fight.

The court also gave the jury a general instruction on inferences, defining an inference as "a reasonable conclusion of fact which you may, but are not required to make, from other facts which you find have been established by direct evidence."

{¶28} Carrion argues that it was error for the court to instruct the jury based on the language contained in R.C. 959.16(A)(5) because the subsection is "ambiguous and, ultimately, incoherent." (Emphasis omitted.) He argues that the statute must be read to require both (1) the payment of money or giving of value, and (2) the presence of one, acting knowingly, at a dogfight. As such, he argues that the court should have instructed the jury that mere presence at the scene of a crime is insufficient to sustain a conviction. He further argues that the court should have issued the jury a prohibitive instruction regarding inference-stacking. According to Carrion, without that instruction the jury was "free to speculate and use their imagination to infer facts far from the actual state of the evidence * * *."

{¶29} This Court agrees with Carrion insofar as he argues that R.C. 959.16(A)(5) is ambiguous. We do not agree, however, that it is appropriate to read the statute in the conjunctive. As previously noted, this Court has interpreted R.C. 959.16(A)(5) as requiring the State to prove *either* that a person (1) knowingly paid money or gave something of value for admission to a dogfight, *or* (2) knowingly was present at a dogfight. *Taylor*, 2016-Ohio-7953, at ¶ 15. Accordingly, had the trial court instructed the jury that both actions were necessary to

sustain a conviction under R.C. 959.16(A)(5), the court would have been issuing an incorrect statement of law. Carrion had no right to an instruction that amounted to an incorrect statement of the law. *See Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, at ¶ 240.

{¶30} As to Carrion's remaining arguments, he has not shown that he was prejudiced by the trial court's refusal to instruct the jury on mere presence and inference-stacking. *See Sanders*, 2009-Ohio-5537, at ¶ 45, quoting *Azbell*, 2008-Ohio-2639, at ¶ 52. The trial court specifically instructed the jury that Carrion could only be convicted if he possessed "an awareness of the probability that he * * * [was] present at a dog fight." Thus, the jury could not have convicted Carrion if it found that he was present, but did not know that he was at a dogfight. Further, the record does not support Carrion's argument that the jury had to engage in inference-stacking to reach the result in this matter. To the contrary, the record reflects that the State presented circumstantial evidence tending to show that Carrion was knowingly present at a dogfight. *See* Discussion, *supra*. Carrion, therefore, has not shown that a prohibitive instruction about inference-stacking would have changed the result here. *See Sanders* at ¶ 45, quoting *Azbell* at ¶ 52. His first assignment of error is overruled.

III.

{¶31} Carrion's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.