[Cite as *State v. Spear*, 2017-Ohio-169.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No. 28181 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DARIUS D. SPEAR | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 14 11 3501 (K) |

DECISION AND JOURNAL ENTRY

Dated: January 18, 2017

SCHAFER, Judge.

{¶1} Defendant-Appellant, Darius Spear, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of November 15, 2014, multiple law enforcement agencies conducted a raid at a home in Akron. The raid occurred because the police suspected that a large scale, illegal dogfight was set to occur on the property. As a result of the raid, the police arrested more than 45 individuals in connection with dogfighting. Spear was one of the individuals whom the police arrested. At the time of his arrest, he had $1,496 in cash on his person.

{¶3} A grand jury indicted Spear on one count of dogfighting, in violation of R.C. 959.16(A)(5), as well as a criminal forfeiture specification for the $1,496 in cash. Spear ultimately went to trial along with three of his co-defendants, all of whom requested a jury trial. At the conclusion of the trial, the trial court entered a judgment in favor of Spear on the

forfeiture specification. The jury then deliberated on the remaining dogfighting charge and found Spear guilty. The court sentenced Spear to two years of community control and a fine.

{¶4} Spear now appeals from his conviction and raises two assignments of error for our review. For ease of analysis, we reorder the assignments of error.

II.

**Assignment of Error II**

**There was insufficient evidence to support the Appellant's conviction for dogfighting.**

{¶5} In his second assignment of error, Spear argues that his conviction for dogfighting is based on insufficient evidence. We disagree.

{¶6} A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. After such an examination and taking the evidence in the light most favorable to the State, we must decide whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶7} R.C. 959.16(A)(5) provides that "[n]o person shall knowingly * * * [p]ay money or give anything else of value in exchange for admission to or be present at a dogfight." This Court recently examined the foregoing statute and found it to be ambiguous. *See State v. Taylor*, 9th Dist. Summit No. 28091, 2016-Ohio-7953. We, therefore, conducted a statutory analysis and determined that R.C. 959.16(A)(5)'s legislative history supports a disjunctive reading of the

statute. *Id.* at ¶ 12-15. We held that, to support a conviction under R.C. 959.16(A)(5), the State may prove either that a person (1) knowingly paid money or gave something of value for admission to a dogfight, or (2) knowingly was present at a dogfight. *Id.* at ¶ 15. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Former R.C. 2901.22(B).

{¶8} Captain Clark Westfall testified that he helped organize a raid at a home in Akron, where the police suspected that the owner was conducting a dogfighting operation. As part of its case-in-chief, the State introduced several pictures of the target residence, two of which are aerial map views. The pictures show that the home is located at the end of a dead-end street and has a sizeable backyard that abuts a noise barrier for the freeway. The backyard contains a detached garage as well as a freestanding trailer. The front of the home faces west, and the entire backyard is enclosed by a fence. The fence joins to the house on the house's north and south sides such that the fence traverses the driveway for the residence. The portion of the fence that traverses the driveway and connects with the south side of the house is a large, retractable gate.

{¶9} Captain Westfall testified that multiple law enforcement agencies took positions around the target residence at approximately 7:00 p.m. and conducted surveillance as numerous people entered the fenced-in backyard. The Captain learned from a source that the property's retractable gate was closed and locked when dogfighting activity was occurring. Accordingly, that evening, an armored vehicle was waiting at a nearby facility for Captain Westfall's command. Once the gate to the property closed, Captain Westfall signaled for the armored vehicle, which breached the retractable gate at 10:41 p.m. Captain Westfall testified that, from the point in time that the retractable gate closed until the armored vehicle arrived to breach it,

between nine and ten minutes elapsed. He stated that, once the gate was breached, the scene became "very chaotic" with people "running around, throwing things, [and] screaming." A total of 52 law enforcement officers ultimately responded to the scene that evening, and 47 individuals were arrested.

{¶10} On the evening of the raid, Detective Mark Hockman was tasked with maintaining surveillance from a public walkway that ran along the south edge of the target residence. From his position, he could observe portions of the backyard as well as the street leading to the property. According to Detective Hockman, the police were led to believe a dogfight would occur at the property between 10:00 and 11:00 p.m. and that the fight would begin when the retractable gate closed. Eventually, the gate closed, and Detective Hockman watched for approximately 12 more minutes. During that time, he observed the individuals gathered in the backyard form "a single file formation towards the north end of the [detached] garage." Detective Hockman could not see the north side of the garage from his position, but knew that a man door was located there and assumed that the group was walking into the garage. He testified that, at some point before the armored vehicle arrived, he then noticed individuals leaving the garage area. Although Detective Hockman could not recall exactly how long the individuals that he saw remained in the garage area, he confirmed that a typical dogfight can last anywhere from 30 seconds to an hour.

{¶11} Detective Hockman testified that, as soon as the armored vehicle breached the retractable gate, people scattered and "were flying out of the garage and running in * * * all sorts of directions." He quickly went to assist other officers in their attempt to detain the fleeing individuals and, following the chaos, further aided in the investigation on the property. He testified that the police ultimately seized $52,000 that evening and $1,496 of that amount came

from Spear. Detective Hockman confirmed that several of the individuals they arrested that evening came from out of state and that dogfighting is funded by both the spectators who pay admission to watch the fights and the gambling that takes place when individuals bet on the outcomes of the fights. According to Detective Hockman, dogfights are meticulously planned well in advance and are "very secretive." With regard to the target residence here, Detective Hockman noted that someone "went to great lengths [to] secur[e] [it] as a clandestine area to operate * * * these dogfights * * *." He opined, based on his training and experience, that it would not be possible for someone to be present and not know they were at a dogfight.

{¶12} Detective Brian Boss testified that he acted as the lead operator for the Akron SWAT team when the raid ensued. He stated that his team was the first to breach the backyard after the gate was compromised and that he immediately rounded the southeast corner of the house. In the area between the north side of the detached garage and the north fence line, he briefly observed approximately 40 people standing near the garage watching two men taunt two pit bulls on separate leashes. The crowd then scattered, and Detective Boss and his team gave chase. He testified that there was "cash everywhere," including on the ground.

{¶13} Officer Delvin Pickett, a member of the crime scene unit, testified that he took a video recording of the scene at the property after the raid occurred. The video recording documents numerous items related to dogfighting. Inside the detached garage at the property, Officer Pickett found a large, square, freestanding ring that looks to have been constructed from wood and other materials. The inside flooring of the ring was carpeted and had several long pieces of duct tape arranged in lines. Officer Pickett stated that both the lines of duct tape and the inside walls of the ring were covered in "wet, fresh blood." Officer Pickett also found inside

the garage buckets of water, sponges, and bloodied break sticks. There was testimony that break sticks are used to pry open a dog's mouth when it has latched onto another dog.

{¶14} Apart from the detached garage, Officer Pickett also documented the inside of the freestanding trailer at the southeast corner of the backyard and a separate, fenced area that he found there. The trailer contained more buckets of water and sponges, a filthy shower area, and weighing scales. In the separate, fenced area, Officer Pickett found individual, enclosed cages for dogs, kennels, chains, and bowls. At the time that he recorded the scene, at least one dog was still confined in one of the kennels in the fenced-in area.

{¶15} In addition to filming the contents of the structures on the property, Officer Pickett also documented the numerous vehicles that were on scene when the raid commenced. Several of the vehicles were parked inside the enclosed backyard and additional vehicles were parked at a vacant lot that was located to the north of the target residence. Officer Pickett testified that he was able to observe kennels in a number of the vehicles that he recorded, including the vehicles parked in the backyard. At least one of the kennels had a dog inside of it.

{¶16} Detective Mildred Morris, another member of the crime scene unit, testified that she also documented various aspects of the scene that evening. As part of her duties, Detective Morris photographed several of the individuals who were arrested at the scene. She identified Spear as one of the arrestees whom she photographed at the property that evening.

{¶17} Officer Tim Harland testified that he works for the Summit County Humane Society and was present at the target residence to secure the dogs on scene and provide them any necessary medical treatment. He testified that he ultimately collected eight dogs from the property that evening, all of which were either pit bulls or pit bull mixes. Of the eight dogs collected, one dog had to be euthanized for safety reasons because he was vicious. Two of the

other dogs had actively bleeding puncture wounds that were consistent injuries a dog would receive from another dog. Based on his training and experience, Officer Harland opined that the two injured dogs had been involved in a dogfight "[v]ery recently."

{¶18} Maurice Wynn, Jr., one of Spear's co-defendants, testified for the State pursuant to a plea agreement. Wynn agreed that he came to the target residence the evening of the raid to watch dogfights and that the owner of the residence, Alvin Banks, charged him $75 to see the fights. Wynn testified that Banks personally called him to invite him to the fights. According to Wynn, he came to the fights alone, could not say who else was there, did not know how any of the other people there received their invitations, and did not know if anyone else paid to see the fights. Wynn agreed that people were betting on the winners of the dogfights that night and that one dogfight took place before the police conducted their raid. He testified that the fight took place inside the detached garage and that, before it started, Banks signaled for him to enter the garage. Wynn admitted that there were other people in the garage, but stated that he did not know how many. He did agree, however, that everyone who had been gathered in the yard went into the garage and that he came back outside when the fight ended.

{¶19} Robby Hollis, another of Spear's co-defendants, also testified for the State pursuant to a plea agreement. Hollis admitted that he had been friends with Alvin Banks for several years and that, before the evening of the raid, he had attended dogfights at Banks' residence on two separate occasions. Hollis testified that Banks invited him to fights by word of mouth. He agreed that, during the two previous fights, he personally saw Banks collect money from people for admittance to the fights. According to Hollis, Banks was standing near the retractable gate when he arrived on the evening of the raid and waived him through without payment. He was able to observe, however, Banks collect money from four or five other

individuals as he made his way inside. Hollis indicated that he saw two injured dogs standing by the gate when he arrived, but that he missed the first dogfight that occurred that evening. He agreed that people were gambling on the dogs at the fights he previously attended at Banks' residence.

{¶20} Spear concedes that a dogfight occurred at the target residence on the evening of his arrest. He argues that his dogfighting conviction is based on insufficient evidence because there was no evidence that he paid money or gave anything of value for admission to the fight or that he actually witnessed a dogfight that evening. He notes that there was no testimony that he actually entered the garage where the dogfight occurred. He further argues that R.C. 959.16(A)(5) "requires more than mere presence, it requires the paying of a fee in exchange for admission."

{¶21} As previously noted, this Court has interpreted R.C. 959.16(A)(5) as requiring the State to prove *either* that a person (1) knowingly paid money or gave something of value for admission to a dogfight, *or* (2) knowingly was present at a dogfight. *Taylor*, 2016-Ohio-7953, at ¶ 15. Accordingly, the State was not required to prove that Spear paid money or gave something of value for admission to the dogfight(s) at the target residence. Spear's conviction can stand so long as the State set forth sufficient evidence that he was knowingly present at a dogfight. Viewing all the evidence in a light most favorable to the State, we must conclude that the State satisfied its burden of production on that issue.

{¶22} There was limited testimony at trial that specifically pertained to Spear, but Detective Morris did identify him as one of the arrestees she photographed at the target property and Detective Hockman did testify that, at the time of his arrest, Spear had $1,496 in cash on his person. Moreover, Detective Hockman opined, based on his training and experience, that it

would have been impossible for someone to be present that evening and not know they were at a dogfight. He noted that dogfights are "very secretive" and planned well in advance. There was testimony that the property here was entirely surrounded by a fence and that the large, retractable gate that completed the enclosure was secured when the dogfights started. There also was testimony that, from the time the gate closed until it was breached, it remained closed and, during that timeframe, the crowd appeared to enter the detached garage where the fight occurred. Detective Boss also saw a large crowd watching two men taunt two pit bulls when he entered the property behind the armored vehicle. There was testimony that the police collected approximately $52,000 that evening and that they found significant sums of money on the ground where it had been thrown when the raid commenced. Given the presence of the dogs, the behavior of the crowd, the clandestine nature of the event, and the large quantities of money that the crowd had on hand, a rational trier of fact could have concluded that Spear was knowingly present at a dogfight that evening. *See* former R.C. 2901.22(B) (defining the circumstances in which a person acts "knowingly"). Spear has not shown that his dogfighting conviction is based on insufficient evidence. Consequently, his second assignment of error is overruled.

### Assignment of Error I

**The trial court abused its discretion when it determined that the State's witness Maurice Wynn was "adverse" or "hostile" and allowed the State to cross-examine the witness.**

{¶23} In his first assignment of error, Spear argues that the trial court abused its discretion when it declared a State's witness hostile and/or adverse and allowed the State to ask him leading questions on direct examination. Because Spear has not explained how he was prejudiced by the trial court's ruling, we overrule his assignment of error.

{¶24} "Evid.R. 611(C) generally prohibits the use of leading questions on direct examination." *State v. McKelton*, Slip Opinion No. 2016-Ohio-5735, ¶ 150. A trial court may permit the use of leading questions, however, when "a party calls a hostile witness, an adverse party, or a witness identified with an adverse party * * *." Evid.R. 611(C). "A witness who has a strong affinity to the defendant is a witness 'identified with an adverse party.'" *State v. White*, 9th Dist. Lorain No. 94CA005936, 1995 WL 338423, *4 (June 7, 1995). "'A hostile witness is one who is so evasive or uncooperative on examination that his testimony is impeded.'" *McKelton* at ¶ 152, quoting Weissenberger, *Ohio Evidence: 1991 Courtroom Manual* 170 (1991).

{¶25} "The determination of whether a witness is hostile or adverse is entrusted to the sound discretion of the trial court." *State v. Rutkowski*, 9th Dist. Lorain No. 94CA005831, 1995 WL 324085, *2 (May 31, 1995). Consequently, we "review a trial court's application of [Evid.R. 611(C)] for an abuse of discretion." *McKelton* at ¶ 150. *Accord State v. Wilson*, 9th Dist. Lorain No. 96CA006412, 1997 WL 164304, *7 (Apr. 2, 1997) ("The trial court has discretion to permit the [S]tate to ask leading questions of its own witnesses."). An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶26} The State's first witness was Marcus Wynn, Jr. The prosecutor asked Wynn his name, age, and employment status before requesting a sidebar. An off the record discussion then took place, after which the prosecutor asked the court to call Wynn as its own witness due to his status as a co-defendant. *See* Evid.R. 614(A). The court declined to do so, but stated that it would declare Wynn an adverse witness. In response, defense counsel asked whether the court intended to declare Wynn a hostile witness, and the court confirmed that it was its intention to do

so because Wynn was a defendant. An additional discussion then ensued wherein defense counsel argued that Wynn had yet to demonstrate any hostility. The prosecutor noted that the court had declared Wynn a hostile witness in a prior trial against other co-defendants in this matter. The following discussion then took place:

THE COURT: [Wynn] does not want to be here.

[DEFENSE COUNSEL FOR CO-DEFENDANT]: He hasn't said that yet. I don't know. I mean, you know that; [the jury] [does not] know.

THE COURT: It doesn't matter what they know. It matters what I know. They don't judge admissibility of evidence.

Over the objection of both defense counsels, the court then permitted the State to ask Wynn leading questions.

{¶27} Spear argues that the trial court abused its discretion by declaring Wynn to be either a hostile or adverse witness. He argues that the court could not declare Wynn hostile because he had not yet shown any reluctance to testify and the State failed to establish either surprise or that it would suffer affirmative damage as a result of his testimony. *See* Evid.R. 607(A). He further argues that Wynn was not adverse to the State because he was testifying pursuant to a plea agreement. Spear argues that the court could not rely upon its knowledge of what occurred during other trials to determine Wynn's status as a hostile or adverse witness in the present matter.

{¶28} It is not clear from the record whether the trial court found Wynn to be a hostile witness, an adverse witness, or both, given that the court used both terms when it issued its ruling. To the extent the court intended to declare Wynn a hostile witness, Spear is correct that the court could not rely on its knowledge of prior proceedings in other cases to make that determination. *See State v. Vaughn*, 9th Dist. Summit No. 27902, 2016-Ohio-7384, ¶ 25, quoting *In re J.C.*, 186 Ohio App.3d 243, 2010-Ohio-637, ¶ 14 (9th Dist.) (court only may take

judicial notice of prior proceedings in immediate case). Even so, we need not determine whether the trial court abused its discretion when it allowed the State to cross-examine Wynn. That is because, even assuming that the court abused its discretion, Spear has not shown that he was prejudiced as a result of the court's ruling. *See State v. Foster*, 9th Dist. Summit No. 14277, 1990 WL 72345, *2 (May 23, 1990) ("Leading questions * * * may not be a ground for reversal on review unless prejudice results.").

{¶29} As previously noted, Wynn's testimony was that a dogfight occurred at the target residence before the raid, he leaned about the fight from Alvin Banks, he paid money to see the fight, the fight occurred in the garage, and other people, none of whom he could identify, were present for the fight. Even without his testimony, however, the record contains evidence on each of the points he raised. Spear concedes that a dogfight took place on the property that evening. Further, Hollis, another co-defendant, testified that Banks invited him to the dogfight and collected money from people for admission to the fight. There was evidence that the dogfight took place in the garage, as the ring contained therein was covered with fresh blood and at least two dogs showed signs of very recent trauma. Moreover, there was testimony that the fight occurred after the gate closed, that one of the SWAT team members saw the crowd move to the garage at that time, and that he later saw the crowd leaving the garage area. That same SWAT team member, Detective Hockman, also opined that it would have been impossible for someone to be present that evening and not know they were at a dogfight.

{¶30} Spear has not made any attempt to explain how he was prejudiced by the prosecutor's use of leading questions when he examined Wynn. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out."). Even

assuming that the trial court abused its discretion by declaring Wynn a hostile or adverse witness, "[l]eading questions * * * may not be a ground for reversal on review unless prejudice results." *Foster* at *2. Spear has not shown that, had the State not been allowed to cross-examine Wynn, the result of his trial would have been different. *See id.* Accordingly, his first assignment of error is overruled.

### III.

**{¶31}** Spear's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CARR, P. J.
MOORE, J.
CONCUR.


APPEARANCES:

STACY MCGOWAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and TABITHA B. STEARNS, Assistant Prosecuting Attorney, for Appellee.