[Cite as *State v. Palmer*, 2017-Ohio-2639.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.    28303 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ANDREW G. PALMER | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 2015 04 1264 |

DECISION AND JOURNAL ENTRY

Dated: May 3, 2017

TEODOSIO, Judge.

{¶1}    Appellant, Andrew G. Palmer, appeals from his convictions for possession of marijuana and trafficking in marijuana in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}    Akron Police Detective Chris Carney works in parcel interdiction with his K-9 partner named "Cruiser." Cruiser alerted to a FedEx parcel sent by Mr. Palmer to someone in California. Detective Carney obtained a warrant to search the parcel and discovered $18,000.00 in cash inside.

{¶3}    The next day, Detective Carney performed a "knock and talk" at Mr. Palmer's house along with Detectives Nicholas Gray and Matt Akers. Detective Carney knocked on the front door for about five minutes before Mr. Palmer eventually opened it. The officers soon entered the house and engaged Mr. Palmer in a discussion in his living room about the FedEx

parcel. Mr. Palmer admitted to sending the money and offered different stories explaining the cash shipment. He said it was for a business for his nephew, but later said it was for a marijuana investment out in California. Detective Carney noticed a jar of marijuana on a table in the dining room. Mr. Palmer was arrested and the officers waited while they secured a search warrant for the house. Mr. Palmer had $495.00 in cash on his person. While awaiting the search warrant for the house, UPS delivered another parcel to Mr. Palmer's house. Mr. Palmer refused to allow the police to open the UPS parcel and told them that they needed a warrant.

{¶4} The officers procured search warrants for the house and the UPS parcel. In the house, they discovered $5,980.00 in cash hidden in a work boot or shoe, a pound of marijuana in a vacuum-sealed bag at the bottom of a clothes basket, and other contraband. In the UPS parcel, they discovered three more pounds of marijuana in vacuum-sealed bags.

{¶5} Mr. Palmer was charged with possession of marijuana, trafficking in marijuana, two forfeiture specifications, and having weapons while under disability. After a jury trial, he was convicted of possession of marijuana and trafficking in marijuana. The trial court determined that the two offenses were allied offenses of similar import and merged the possession offense into the trafficking offense for sentencing. The jury found that $23,980.00 of the $24,475.00 seized was subject to forfeiture. Mr. Palmer was sentenced to thirty months in prison.

{¶6} Mr. Palmer now appeals from his convictions and raises six assignments of error for this Court's review.

{¶7} For ease of analysis, we consolidate Mr. Palmer's first, second, and third assignments of error.

II.

## ASSIGNMENT OF ERROR ONE

ONCE IT IS DETERMINED (IN A SEARCH) THAT A [FEDEX] PACKAGE DOES NOT CONTAIN ANY CONTRABAND, THUS LACKING ANY PROBABLE CAUSE TO DO SO, ANY FURTHER DETENTION (OF THE MAILED PACKAGE) VIOLATES THE FOURTH AMENDMENT. WITH THIS BEING SO, THE COURT ERRED WHEN IT REFUSED TO GRANT THE MOTION TO SUPPRESS AND ORDER THE RETURN OF THE MONEY TO THE SENDER.

## ASSIGNMENT OF ERROR TWO

GIVEN THE FACT THAT IT IS INDISPUTABLE THE FEDEX PACKAGE THE OFFICER EXTRACTED FROM THE MAIL DID NOT CONTAIN ANY CONTRABAND[,] IT FOLLOWS HIS FURTHER DETENTION AND RETENTION OF THIS PACKAGE, ON HIS OWN AUTHORITY, VIOLATED THE FOURTH AMENDMENT; HENCE THE COURT ERRED WHEN [IT] DENIED THE MOTION TO SUPPRESS AND WHEN [IT] REFUSED TO ORDER THE MONEY RETURNED TO THE APPELLANT.

## ASSIGNMENT OF ERROR THREE

ONE WHO OPENS THE DOOR OF HIS HOME IN THE WAKE OF PERSISTENT DEMANDS OF THE POLICE DOES NOT DO SO VOLUNTARILY. WITH THIS BEING SO, THE COURT ERRED WHEN IT RULED THE ENTRY HERE AS CONSENSUAL.

**{¶8}** In his first, second, and third assignments of error, Mr. Palmer argues that the trial court erred in denying his motion to suppress because (1) the officers unlawfully retained the FedEx package after searching it and discovering only cash inside, and (2) he did not voluntarily consent to the officers' entry into his house. We disagree.

**{¶9}** A motion to suppress presents a mixed question of law and fact:

When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently

determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

*State v. Oberholtz*, 9th Dist. Summit No. 27972, 2016-Ohio-8506, ¶ 5, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003–Ohio–5372, ¶ 8.

{¶10} In his motion to suppress, Mr. Palmer requested "an Order suppressing all oral statements made to law enforcement officers during the course of the illegal detention and subsequent searches conducted in this matter" because "law enforcement entered [his] residence without invitation and without consent" and "illegally gathered information was used to secure a search warrant for [his] residence * * *." Therefore, "sufficient probable cause did not exist for the judge to issue the search warrant [for the house.]"

{¶11} Initially, we note that the motion did not address any alleged unlawful retention of the FedEx parcel. At the two suppression hearings, Mr. Palmer challenged the officers' entry into his house and the validity of the initial search warrant to open the FedEx parcel. He did not make any argument to the trial court regarding any unlawful retention of the FedEx parcel by police after it was searched and only cash was found inside. Accordingly, Mr. Palmer has forfeited this particular issue for purposes of appeal and we decline to address it. *See State v. Clayton*, 9th Dist. Summit No. 27290, 2015-Ohio-663, ¶ 14.

{¶12} Mr. Palmer also argues that he did not voluntarily consent to the police officers entering his house. The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." Article I, Section 14, of the Ohio Constitution contains nearly identical language. "For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant, unless an exception to

the warrant requirement applies." *State v. Hetrick*, 9th Dist. Lorain No. 07CA009231, 2008-Ohio-1455, ¶ 19; citing *Katz v. United States*, 389 U.S. 347, 357 (1967).

{¶13} The Supreme Court of Ohio has explicitly recognized consent as an exception to the warrant requirement. *Id.* at ¶ 21. "Where [a] police officer reasonably relies upon consent given by an occupant of [a] premises to enter upon the premises, the entry upon the premises does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures." *State v. Harris*, 2d Dist. Montgomery No. 19479, 2003-Ohio-2519, ¶ 22, citing *Illinois v. Rodriguez*, 497 U.S. 177, 187 (1990). "Whether consent was voluntarily given is a question of fact to be determined from the totality of the circumstances, and the government bears the burden of showing that consent was 'freely and voluntarily' given by 'clear and positive' evidence." *State v. Cummings*, 9th Dist. Summit No. 20609, 2002 WL 57979, *3 (Jan. 16, 2002).

> A person can demonstrate consent to enter either expressly or impliedly. Courts have found such actions as opening a door and stepping back, or leading an officer through an open door without expressing an intent that he should not follow constitute implied consent. Further, voluntarily opening a door constitutes voluntary consent to step into the threshold of an apartment.

(Citations omitted.) *State v. Cooper*, 9th Dist. Summit No. 21494, 2003-Ohio-5161, ¶ 9.

{¶14} At the two suppression hearings, the trial court heard conflicting testimony regarding the circumstances surrounding the officers' initial entry into Mr. Palmer's house from six different witnesses, including three police detectives, Mr. Palmer, a neighbor who lives down the street, and a woman who was in a nearby driveway getting her brakes fixed.

{¶15} Detective Carney testified that he asked Mr. Palmer if he could come inside and talk to him and Mr. Palmer said, "Come on in" and made a welcoming gesture with his hand. After Detective Carney entered the house, Mr. Palmer saw the other officers and objected to

those officers coming inside. However, Detective Carney explained to Mr. Palmer that police protocol would not allow him to enter the house alone.

{¶16} Mr. Palmer emphasizes the following exchange during Detective Carney's testimony at the suppression hearing to assert that he involuntarily consented to the officer entering his house:

Q: So, when you say he invited me into the house and you asked him if you could come in, exactly and as specifically as you can, how does that exchange occur?

A: Do you mind - - **I *need* to come in and talk to you about some things**.

* * *

Q: And then I believe you said that another detective was behind you and also entered the home?

A: That's correct.

(Emphasis sic.). Mr. Palmer argues that Detective Carney was on a mission and his use of the word "need" indicated that Mr. Palmer was essentially required to involuntarily consent to the officer entering his house and submit to intimidation.

{¶17} However, Mr. Palmer uses an ellipsis to replace some particularly relevant testimony from Detective Carney regarding his recollection as to whether Mr. Palmer consented to the detective's entry into the house. A more complete version of the officer's testimony at the hearing regarding his entry into the house is as follows:

Q: So, he comes to the door, and you said he opens the door?

A: Yes, sir.

Q: Okay. And we want to get specific here. Does he have, like, a storm door, an inner door?

A: Two doors, the storm door and the interior door.

Q: And how does he open the door? I mean, what's the posture here?

A: Well, in my report, like I said, I saw him on the couch. As we're knocking, he - - I can only assume that he's hearing us talk outside. He kind of slinks off the couch. I don't know if he was attempting to hide. He slinks off the couch. We continue to knock. He comes to the door. He is out of breath, nervous. Opens the door. Opened the door and - - I've been - - I've been a narcotics detective for years. I smell marijuana.

Q: Okay. As soon as he opens the door?

A: Yeah.

Q: All right. So, what do you do then?

A: I asked him to come in and talk, and he does invite us in. He was fine with me coming in. He was, like, I didn't invite those guys in. But, once again, police protocol, the officers I'm with are not going to let me go into a house by myself.

THE COURT: Can you say that again[?]

A: He let me into the house. I stepped into his living room. I believe it was either Nick Gray that followed me into the house, and Mr. Palmer said, I didn't invite him in. And I said, well, he's in here because I'm talking to you.

Q: So, when you say he invited me into the house and you asked him if you could come in, exactly and as specifically as you can, how does that exchange occur?

A: Do you mind - - I need to come in and talk to you about some things.

Q: That's what - -

A: Yeah.

Q: To the best you can recall, that's exactly what you asked him?

A: That would be pretty standard. That would be - - sir, you know, can I come in and talk to you?

Q: What - - how does he respond?

A: He says, well, come on in (indicating). He opens up the door, and I walk right in.

Q: I mean, he actually verbalizes it and - - I know I'm getting very specific for the record. You actually made a motion with your hand.

A: Hand (indicating).

Q: Like as if to welcome him in. Do you recall that he - -

A: He said - - I asked, can I come in and talk to you? He said yeah. And I stepped into the residence.

Q: Okay. So - - and at that time, during that exchange, did Mr. Palmer do anything that you remember to indicate that he did not want you to come in?

A: No.

Q: And then I believe you said that another detective was behind you and also entered the home?

A: That's correct.

Q: And Mr. Palmer said, no, I don't want him in here, or - -

A: Right.

Thus, Detective Carney's use of the word "need" while testifying at the hearing, when viewed in context with the rest of his testimony regarding his entry into the house, is not as outrageous as Mr. Palmer would have this Court believe. The detective repeatedly testified that he asked Mr. Palmer for permission to enter the house and Mr. Palmer allowed him inside.

{¶18} Detective Gray also testified that Mr. Palmer invited Detective Carney inside. Detective Gray testified that he entered the house after Detective Carney and that Mr. Palmer may have calmly asked who Detective Gray was, but Mr. Palmer did not do anything to indicate that he did not want Detective Gray in his house.

{¶19} Detective Akers testified that he positioned himself on the side of Mr. Palmer's house to make sure no one ran out the back of the house while Detective Carney was knocking on the front door. He could not see Detective Carney, but soon heard Detective Carney speaking to someone and could not hear what they were talking about. As Detective Akers came back to

the front of the house, he saw Detective Gray entering the house. Detective Akers then entered the house as well.

**{¶20}** Mr. Palmer testified that he opened the door and Detective Carney snatched the storm door out of his hand, went chest to chest with him, and barked, "Get back" in his face. Mr. Palmer jumped back and the officers entered his house. They spoke to him about the FedEx parcel and Mr. Palmer asked if they had a warrant. The officers looked at each other and Mr. Palmer said, "You all need to get the fuck out of my house."

**{¶21}** H.M. testified that she was across the street and a few houses down from Mr. Palmer's house getting the brakes fixed on her car. She heard banging on a door and looked across the street to see people standing on Mr. Palmer's front porch. Once the front door was opened, she heard someone say what sounded like "Get back" and the men entered the house.

**{¶22}** A.C. testified that he lives past the intersection and two doors down from Mr. Palmer on the same side of the street. He was checking his mail and heard some beating on Mr. Palmer's door. He saw the officers snatch the door and heard someone say, "Get back." He admitted on cross-examination that he is friends with Mr. Palmer and that they talk to each other every day. He also admitted that he talked to Mr. Palmer about this incident after it happened.

**{¶23}** Detective Carney testified on rebuttal that he never told Mr. Palmer, "Get back," but he yelled, "Hey Matt" to Detective Akers who was around the side of the house.

**{¶24}** "When there is a conflict in the testimony of witnesses, as here, it is for the trier of fact to determine the weight and credibility to be given such evidence." *State v. Pamer*, 70 Ohio App.3d 540, 543 (9th Dist.1990). Here, the trial court stated in its order that it "considered all of the testimony, the demeanor of the witnesses and all the facts and circumstances in this case." The court found that "the testimony of the investigating officers is more credible" and "it

has been demonstrated by clear and convincing evidence that their entry into the house and the subsequent interview was consensual." The court noted that although Mr. Palmer initially objected to more than one officer entering his house, he was told it was required for officer safety. The court found that "[Mr. Palmer] did not terminate his consent based upon that factor but allowed the interview to continue." The trial court ultimately found that "based upon all the facts and circumstances, the entry and continued presence of the officers in the house was with [Mr. Palmer's] consent * * *."

{¶25} Upon review of the record, this Court accepts the trial court's findings as supported by competent, credible evidence. *See Burnside*, 100 Ohio St.3d at ¶ 8. The trial court was in the best position to resolve factual questions and evaluate the credibility of witnesses. *See id.* We conclude that the trial court did not err in finding that the detectives entered and remained in the house with Mr. Palmer's consent. Accordingly, the trial court did not err in denying Mr. Palmer's motion to suppress.

{¶26} Mr. Palmer's first, second, and third assignments of error are overruled.

### ASSIGNMENT OF ERROR FOUR

GIVEN A JURY'S QUESTION WHICH ASKED, IN EFFECT: WHETHER THE "G" (THE MIDDLE INITIAL OF THE DEFENDANT AS INDICATED IN THE INDICTMENT) WAS CONSISTENT WITH THE NAME "GREG PALMER" TO WHOM THE UPS PACKAGE (CRITICAL IN THIS CASE) WAS MAILED, THE COURT ERRED AND DENIED DUE PROCESS WHEN IT, NOT ONLY, REFUSED TO TAKE JUDICIAL NOTICE BUT ALSO WHEN IT FAILED TO INSTRUCT THE JURY THE DEFENDANT'S MIDDLE NAME WAS NOT GREG.

{¶27} In his fourth assignment of error, Mr. Palmer argues that the trial court erred (1) by not taking judicial notice that his middle initial does not stand for Greg and (2) by not instructing the jury that his middle name is not Greg. We disagree.

{¶28} Courts may take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). "Judicial notice may be taken at any stage of the proceeding." Evid.R. 201(F). "In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed." Evid.R. 201(G).

{¶29} "[W]here, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request. A reversal of a conviction based upon a trial court's response to such a request requires a showing that the trial court abused its discretion." *State v. Carter*, 72 Ohio St.3d 545, 553 (1995). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶30} During deliberations, the jury submitted a question to the trial court inquiring what the middle initial "G" stood for in Mr. Palmer's name. Mr. Palmer had a purported social security card and birth certificate with him in court, which stated that his middle name is Griffen. He asked the court to take judicial notice of the fact that his middle name is Griffen or, alternatively, that his middle name is not Greg.

{¶31} Mr. Palmer inaccurately asserts that the prosecutor did not dispute the authenticity of the social security card or birth certificate. The prosecutor initially stated on the record that he could have challenged the documents during trial if they had been brought up during trial. He further stated, "Your Honor, just to clarify, I don't agree that they're credible. That wasn't my initial argument. I'm not going to stipulate to those as being authentic." Mr. Palmer disregards

the fact that the appropriate time to present this evidence was at trial. *See Mentor Economic Assistance Corp. v. Eichels*, 11th Dist. Lake No. 2015-L-097, 2016-Ohio-1162, ¶ 22.

**{¶32}** The trial court responded to the question by instructing the jury as follows:

The Court will instruct you that the evidence has been given to you and the evidence is closed, and the Court cannot give you any more evidence or allow the parties to do so. However, the Court would also tell you that you are not to speculate on what the evidence would mean. If you do not have evidence of an issue, you cannot fill the evidence in by speculating, if you understand what I'm saying.

**{¶33}** Apart from a general reference to Evid.R. 201, Mr. Palmer cites to no other authority, statute, or part of the record and fails to conduct any analysis to support his argument that the trial court erred and should have taken judicial notice or instructed the jury differently. *See* App.R. 16(A)(7); *see also State v. Smith*, 9th Dist. Wayne No. 15AP0001, 2017-Ohio-359, ¶ 31. Consequently, this Court will not address these undeveloped arguments or assume Mr. Palmer's duty and formulate an argument for him. *See State v. Hendon*, 9th Dist. Summit No. 27951, 2016-Ohio-8137, ¶ 21.

**{¶34}** Upon review of the record, this Court cannot say that the trial court abused its discretion and acted unreasonably, arbitrarily, or unconscionably in its instructions to the jury in response to the question.

**{¶35}** Mr. Palmer's fourth assignment of error is overruled.

**{¶36}** For ease of analysis, we consolidate Mr. Palmer's fifth and sixth assignments of error.

## ASSIGNMENT OF ERROR FIVE

WITH FORFEITURE BEING PART OF A DEFENDANT'S SENTENCE, IT FOLLOWS THAT ANY PROPERTY FOFEITED [SIC] MUST BE SHOWN TO HAVE HAD A CONNECTION WITH THE OFFENSE, OR OFFENSES, OF CONVICTION. WITH THIS BEING SO, THE ABSENCE OF ANY SUCH

PROOF HERE RENDERS THE FORFEITURE DECREED [SIC] INDEFENSIBLE.

## ASSIGNMENT OF ERROR SIX

THE COURT ERRED WHEN IT RULED THE VERDICT FINDING THE ACCUSED GUILTY WAS SUFFICIENT TO ESTABLISH GUILT BEYOND A REASONABLE DOUBT.

{¶37} In his fifth and sixth assignments of error, Mr. Palmer challenges the sufficiency of the evidence and argues that (1) there was no evidence that the seized money was connected to the underlying offenses and (2) there was no evidence that he actually possessed the UPS parcel. We disagree with both propositions.

{¶38} "A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo." *State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169, ¶ 6, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "Sufficiency concerns the burden of production and tests whether the prosecution presented adequate evidence for the case to go to the jury." *State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 25, citing *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶39} Mr. Palmer was convicted of possession of marijuana under R.C. 2925.11(A), which states "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Because the amount of marijuana exceeded one thousand grams,

but was less than five thousand grams, possession was a felony of the third degree under R.C. 2925.11(C)(3)(d).

{¶40} Mr. Palmer was also convicted of trafficking in marijuana under R.C. 2925.03(A)(2), which states "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute [marijuana], when the offender knows or has reasonable cause to believe that the [marijuana] is intended for sale or resale by the offender or another person." Because the amount of marijuana exceeded one thousand grams, but was less than five thousand grams, trafficking was a felony of the third degree under R.C. 2925.03(C)(3)(d).

{¶41} R.C. 2901.22(B) states, in part, that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist * * *."

{¶42} R.C. 2925.01(K) states "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." "[A] person may knowingly possess a substance or object through either actual or constructive possession." *State v. Hilton*, 9th Dist. Summit No. 21624, 2004-Ohio-1418, ¶ 16. "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus. "Inherent in the notions of dominion and control is some authority over the object, not merely the ability to have access to it." *State v. Carlton*, 9th Dist. Lorain No. 12CA010219, 2013-Ohio-2788, ¶ 11. "The State may prove dominion and

control through circumstantial evidence." *State v. Rucker*, 9th Dist. Summit No. 25081, 2010-Ohio-3005, ¶ 30.

**{¶43}** The jury also found that $23,980.00 of the $24,475.00 seized by the police was subject to forfeiture under the R.C. 2941.1417 forfeiture specification to the trafficking offense. The $495.00 in cash that was found on Mr. Palmer's person was not subject to forfeiture. "Mere possession of money is not unlawful. Thus, the money is not contraband per se. Further, the burden is on the state to show that the money had any connection to the underlying criminal offense." (Citations omitted.) *State v. Standen*, 9th Dist. Lorain No. 07CA009123, 2007-Ohio-5477, ¶ 9.

**{¶44}** As Mr. Palmer only challenges the sufficiency of the evidence concerning (1) the connection between the money and his trafficking conviction, and (2) his possession of the UPS parcel, we will limit our analysis to the relevant evidence relating to those two issues.

**{¶45}** The State proceeded at trial on a theory that Mr. Palmer was involved in trafficking marijuana by shipping cash to California in exchange for marijuana being shipped to him from California. The police seized 1,670.2 grams of marijuana and $24,475.00 in cash overall. Detective Chris Carney testified that his K-9 partner "Cruiser" alerted to a FedEx parcel sent by Mr. Palmer to California. After procuring a search warrant, he opened the parcel and discovered $18,000.00 in cash. Detective Nicholas Gray testified on cross-examination that for a K-9 to alert on money, the money would have to have been around narcotics in order to pick up the odor.

**{¶46}** The following day, Detective Carney went to Mr. Palmer's house with two other detectives to speak to him about the FedEx parcel. Detective Carney testified that he smelled marijuana as soon as Mr. Palmer opened the front door and Mr. Palmer admitted that he had just

smoked marijuana. Mr. Palmer pointed to an ashtray on a table and Detective Carney saw a "blunt" in the ashtray. Mr. Palmer also admitted that he had shipped the $18,000.00 to California. He provided the officers with different explanations for shipping the money and later said it was for a marijuana investment in California. While talking to Mr. Palmer inside the house, Detective Carney could see a jar of marijuana on the dining room table and a marijuana grinder on the mantel of the fireplace.

{¶47} While awaiting a search warrant for the house, a UPS truck arrived and the driver dropped a parcel off on Mr. Palmer's front porch. The UPS parcel was addressed to Greg Palmer. During their investigation, the officers looked up Mr. Palmer's address, but found no one by the name of Greg Palmer listed as a resident there. Detective Carney testified that in the last six years he has not interdicted a single parcel containing narcotics that had the legal name of the recipient on it because it is easier for people to distance themselves from the parcel and claim that it does not belong to them. Detective Gray also testified that people typically have narcotics shipped to their house under a different name to protect themselves if law enforcement intercepts the parcel. Detective Gray also testified on cross-examination that it is different with currency because a person will not be able to claim an interdicted parcel containing money if it has fake names on it. Detective Carney testified that it is common for drugs and money to both be shipped at the same time as an exchange.

{¶48} Detective Carney testified that he asked Mr. Palmer if he could open the UPS parcel and Mr. Palmer said, "No." Mr. Palmer told the detective, "You need to get a warrant." The officers procured additional search warrants for both Mr. Palmer's house and the UPS parcel. Detective Carney testified that miscellaneous clothes and a hollowed-out pillow containing approximately three pounds of marijuana in vacuum-sealed Ziploc bags were

discovered in the UPS parcel. Detective Gray testified that he found $5,980.00 in cash inside of a work boot or shoe in an upstairs bedroom of the house. He also found a vacuum-sealed bag containing one pound of marijuana underneath clothes at the bottom of a clothes basket. Detective Carney testified that the marijuana packages found in the bedroom and in the UPS parcel were all in the same type of vacuum-sealed, Ziploc bags. Detective Carney also testified that a few additional grams of marijuana, a marijuana brownie, a couple digital scales, a food saver system, bags, bubble wrap, and mail with Mr. Palmer's name and address on it were also found in Mr. Palmer's house.

{¶49} After viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that (1) the money discovered in the FedEx parcel and in Mr. Palmer's house was connected to Mr. Palmer's trafficking in marijuana offense, and (2) Mr. Palmer had constructive possession of the UPS parcel delivered to his house.

{¶50} The evidence, if believed, established that the seized and forfeited money was connected to Mr. Palmer's trafficking offense. *See Standen*, 2007-Ohio-5477, at ¶ 9. Mr. Palmer shipped $18,000.00 in cash via FedEx to California and a UPS parcel from California containing three pounds of marijuana in vacuum-sealed bags arrived on his doorstep the next day. Mr. Palmer eventually admitted that he sent the money to California for a marijuana investment. The UPS parcel was addressed to Greg Palmer, but the detectives found no evidence of anyone by that name living at Mr. Palmer's house. Two detectives testified that drug traffickers commonly use false names on parcels when shipping drugs. A similarly-packaged, vacuum-sealed bag of marijuana was found in Mr. Palmer's house along with $5,980.00 in cash and other contraband associated with the trafficking of drugs.

{¶51} The evidence, if believed, also established that although Mr. Palmer never physically accessed the UPS parcel, he constructively possessed it. The UPS parcel was delivered to the front porch of Mr. Palmer's house. Mr. Palmer refused Detective Carney's request to open it and then told the detective to get a warrant. These statements are assertions of authority over the parcel sufficient to establish dominion and control and, therefore, constructive possession of the UPS parcel. *See Hankerson*, 70 Ohio St.2d at syllabus; *see also Carlton*, 2013-Ohio-2788, at ¶ 11.

{¶52} Mr. Palmer's fifth and sixth assignments of error are overruled.

III.

{¶53} Mr. Palmer's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JAMES R. WILLIS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.