[Cite as *In re J.M.*, 2021-Ohio-4146.]

IN THE COURT OF APPEALS
FORTH APPELLATE DISTRICT
HIGHLAND COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | CASE NO. 21CA13 |
|  |  | 21CA14 |
|  | : | 21CA15 |
| J.M., S.M., D.M., |  | 21CA16 |
| AND B.M., | : |  |
|  |  |  |
| Adjudicated Dependent | : | DECISION & JUDGMENT ENTRY |
| Children. |  |  |
|  | : |  |

_____

APPEARANCES:

K. Danielle Whitt, Hillsboro, Ohio, for Appellant.[1]

Anneka P. Collins, Highland County Prosecuting Attorney, and
James Roeder, Assistant Highland County Prosecuting Attorney,
Hillsboro, Ohio, for Appellee.

_____

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:11-16-21
ABELE, J.

{¶1} This is an appeal from a Highland County Common Pleas Court, Juvenile Division, judgment that granted Highland County Job and Family Services Agency, Children Services Division, appellee herein, permanent custody of four minor children: (1) thirteen-year-old J.M.; (2) eleven-year-old S.M.; (3) eight-year-old D.M.; and (4) six-year-old B.M.

_____

[1] Different counsel represented appellant during the trial court proceedings.

{¶2} Bianca M., the children's biological mother and appellant herein, raises the following assignments of error for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT'S AWARD OF PERMANENT CUSTODY TO THE AGENCY IS WAS [SIC] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THUS CONSTITUTES REVERSABLE [SIC] ERROR."
>
> SECOND ASSIGNMENT OF ERROR:
>
> "THE AGENCY DID NOT USE REASONABLE EFFORTS TO PREVENT REMOVAL OR TO REUNITE THE CHILDREN TO MOTHER-APPELLANT."

{¶3} In August 2019, J.M. disclosed to school friends that her father had sexually abused her. An agency caseworker visited the school to speak with J.M. and she stated that her "father was doing inappropriate things to her and that [appellant] was aware of the allegations." J.M. informed the caseworker that J.M. "drew pictures of her and her father and that [appellant] hid them."

{¶4} When a caseworker spoke with appellant, she admitted to "knowing in her gut that something happened." Appellant did not, however, ask the father to leave the home or report her suspicions to anyone. Appellant advised the caseworker that appellant "didn't think she could raise the kids on her own and chose to ignore the allegations."

{¶5} On August 22, 2019, appellee sought, and received, an emergency temporary custody order. On that same date, appellee filed a complaint that alleged the children are abused, neglected, and dependent and requested temporary custody of the children.

{¶6} On October 18, 2019, appellant and the father admitted to the allegations contained in the complaint and waived their right to an adjudicatory hearing. The trial court adjudicated the children dependent, dismissed the abuse and neglect allegations, and based upon the parties' agreement, the court placed the children in appellee's temporary custody for one year. The court also found that appellee used reasonable efforts to prevent the children's removal from the home.

{¶7} On February 4, 2021, appellee filed a motion for permanent custody. Appellee asserted that the children have been in its temporary custody for at least 12 of the past 22 months and that placing the children in its permanent custody is in the children's best interests.

{¶8} On April 9, 2021, appellee filed a motion that asked the trial court to suspend appellant's visits with the children. Appellee alleged that the three youngest children's foster parents "experienc[ed] an increase with emotional/behavioral issues with the children in the past month." The motion stated

that "SM & BM are struggling the most and fear for their safety since their mother now is aware of their disclosure of sex abuse." Appellee claimed that D.M. "has had an increase in bowel accidents, lying, [and] out of control thoughts." Appellee further indicated that J.M. currently is "in respite due to her ongoing behavioral issues." Appellee also asserted that the children's guardian ad litem recommended that visits be suspended.

**{¶9}** To support its motion, appellee attached a letter from the three younger children's therapist that stated that visits with appellant are not "health[y] or productive" for the children. The therapist's letter also outlined, in more detail, the children's worsening behavioral issues, along with the children's concerns raised regarding their visits with appellant. Subsequently, the court granted the motion to suspend visits.

**{¶10}** On June 4, 2021, the trial court held a hearing to consider appellee's permanent custody motion. At the hearing, the parties presented evidence. Family Advocacy Center visitation monitor Delores Colville testified that appellant attended most of her scheduled visits with the children, interacted appropriately with the children and noted that the children seemed bonded to appellant.

{¶11} Caseworker Rebecca Souther, the family's caseworker since February 2020, stated that the children's father is in prison with an expected release date in 2039. Souther related that the agency developed a case plan for the family with a goal of reunifying the children with appellant. This plan required appellant to complete a psychological evaluation, to continue mental health counseling, to obtain suitable housing, and to maintain employment. Souther explained that appellant continued to receive mental health counseling and had remained employed throughout the pendency of the case. Appellant, however, had recently moved to Mansfield "to get a fresh start."

{¶12} Souther further related that the case plan recommended that all four children receive psychological evaluations and engage in counseling, and the children remain in counseling. Souther reported that, after the children had been removed from appellant's home, the children had been placed with relatives. Approximately four weeks later, however, J.M. entered a residential facility and remained until September 2020 when the agency placed J.M. in a therapeutic foster home. In January 2021, J.M. was removed from the home and placed in respite. Between January 2021 and April 2021, J.M. was placed in two foster homes. In April 2021, the agency placed J.M. in L.N.'s home, and J.M. has remained in L.N.'s home since that time.

{¶13} Souther also explained that the three younger children remained in their relative placements until February 2020, when the agency placed S.M. and B.M. with a foster family.  The children have since remained in the home.

{¶14} After D.M.'s removal from the relative's home, appellee placed him in a therapeutic foster home.  In July 2020, appellee placed D.M. with the same foster family as S.M. and B.M.  Shortly thereafter, D.M. was removed and placed with another foster family.  D.M. has remained with this foster family since that time.

{¶15} Souther testified that the agency eventually determined that reunifying the children with appellant is not possible:

> Throughout the life of this case, the children have struggled with their behaviors, trained foster parents have struggled to manage those behaviors.  And at the beginning of the case, [appellant] did state that she hadn't think [sic] that she was able to manage them.  She has not said that to me since then, but I have a concern for her ability to be able to manage these behaviors with these four children.

{¶16} C.C., a foster parent, stated that S.M. and B.M. have lived in her home since February 2020.  C.C. explained that, when S.M. first entered her home, S.M. was domineering and "had a lot of issue with behavior and attitude and not wanting to listen or comply with rules."  C.C. reported that, at one point,

S.M. had taken a cell phone from school and "tried to send very explicit photos to a young boy at school of her private areas." Additionally, S.M. had several failing grades and displayed aggressive behaviors.

{¶17} C.C. testified that B.M. "was very aggressive" when the child first entered her home. She explained that B.M. "would kick, scream, pull [the foster mother's] hair, yell at [the foster mother], * * * and throw herself to the ground." C.C. further indicated that B.M. had behavioral issues at school and had "to transfer her classroom multiple times until B.M. was placed with a teacher she felt "comfortable with."

{¶18} C.C. stated that neither child slept through the night, and B.M. "had terrible, terrible nightmares." C.C. also testified that both children displayed sexualized behavior and see a trauma-based therapist. Since the children stopped visiting appellant, however, their behaviors have improved. Once visits stopped, S.M. improved her grades and finished the school year with As and Bs. C.C. further explained that, since visits stopped, B.M. has not had nightmares. C.C. stated that she "would love to be able to adopt" B.M. and S.M.

{¶19} C.C. further related that D.M. lived in her home for 17 days and spent four of those days in the hospital. She explained that D.M. broke a bed and tried to tip over a dresser.

Additionally, D.M. "tried to sexually touch [B.M.] multiple times."  At another point, D.M. ran away and she had to call law enforcement to help to locate him.

**{¶20}** D.M.'s current foster parent, Cl.C. testified that D.M. moved into her home in July 2020 following a hospital stay. Cl.C. stated that when D.M. arrived, he was "bubbly" and "started exploring" the house.  Cl.C. related that the next day, D.M. started to call her and her husband "mom and dad."  For the first six weeks, D.M. did not display aggressive behavior, but after six weeks she noticed "a lot of aggression."  He hit, kicked, bit, pinched, and threw things.  He also tried to run away.  Cl.C. stated that she eventually placed a camera in D.M.'s room because he tried to break out the window and run away.

**{¶21}** L.N., J.M.'s foster parent, testified that J.M. has been in her home since April 17, 2021.  L.N. stated that J.M.'s behavior with L.N.'s husband is "borderline inappropriate," because J.M. tries "to tickle him often," "tries to cuddle with him on the couch," and acts "a little bit flirtatious."

**{¶22}** Appellant testified upon cross-examination and indicated that she lives in Mansfield and works at Morrow Manor. She explained she moved to Mansfield because she "wanted a fresh

start." Appellant did acknowledge that the children made some allegations against her, but she denied they are true.

{¶23} Appellant stated that she attends counseling every two weeks to help treat PTSD, anxiety, and depression, and that she takes four prescribed medicines to treat her conditions. Appellant acknowledged that she admitted the children are dependent, and that she stated that she did not believe that she could raise the four children on her own, but she denied that she admitted that she chose to ignore the sexual abuse allegations.

{¶24} Appellant presented several witnesses to testify on her behalf. Amanda Meeker, appellant's best friend, stated that the children did not have behavioral issues before appellee removed them from appellant's custody. Meeker further indicated that she did not have any concerns about appellant's parenting skills.

{¶25} Deborah Britt, the children's great-aunt, testified that, when the agency first removed the children from appellant's custody, the agency placed J.M. and S.M. in her home and placed D.M. and B.M. in Britt's daughter's home. Britt explained that the agency later determined that the children needed counseling and, due to her work schedule it would have been difficult to ensure that the children could attend all of

their counseling sessions.  Thus, the agency placed the children

in foster homes.  Britt stated that, before the agency removed

the children from appellant's care, the children were "well

behaved" and "polite."  Britt also has no concerns about

appellant's parenting abilities.

{¶26} Appellant also presented testimony from her father and

sister, who likewise stated that they have no concerns about

appellant's parenting abilities.

{¶27} On June 7, 2021, the trial court awarded appellee

permanent custody of the four children.  The court first

determined that the children have been in appellee's custody for

12 or more months of a consecutive 22-month period.  The court

next considered the children's best interests and noted that

although appellant attended most of the visits with the children

and the visits "went well," the court expressed concern with

appellant's admission that she believed "in her gut something

had happened," yet did nothing.  The court thus found that

appellant "violated her most basic and fundamental role as a

parent by failing to protect her children and most specifically

J.M. from being raped by [the father]."  The court also noted

that appellant remained married to the father.

{¶28} The trial court also found the foster parents'

testimony "both compelling and heartbreaking."  The court

determined that "all four children observed a way of life with their parents that was destructive and likely caused permanent damage to each of them," that the children have "numerous behavioral issues," and that they "are doing as well in their respective placements as can be expected."

{¶29} The trial court concluded that the parents' "actions as well as inactions" show that the children cannot achieve a legally secure permanent placement without granting appellee permanent custody.  The court additionally observed that the children's guardian ad litem recommended that the court place the children in appellee's permanent custody.

{¶30} Consequently, the trial court determined that the children's placement in appellee's permanent custody is in their best interests and granted appellee permanent custody of the four children.  This appeal followed.

I

{¶31} In her first assignment of error, appellant asserts that the trial court's decision to grant appellee permanent custody is against the manifest weight of the evidence.

{¶32} In particular, appellant contends that the evidence shows that appellee should have attempted to reunify the family. Appellant claims that she (1) complied with her case plan and continued to engage in recommended counseling, (2) consistently

visited the children, (3) remained employed throughout the pendency of the case, and (4) obtained a suitable residence. Appellant further claims that the concerns that led appellee to the children's removal (father's sexual abuse and the condition of the home) have been eliminated. Appellant thus contends that, because appellee did not present any evidence to show that she "would be harmful to the children or that the children would come to harm if returned to the care, custody and control of" appellant, the court should have denied appellee's permanent custody motion and continued work to reunify appellant with the children.

A

**{¶33}** Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 27; *In re R.S.*, 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, ¶ 29.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

**{¶34}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'"  *Eastley* at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord In re Pittman*, 9th Dist. Summit No. 20894, 2002-Ohio-2208, ¶¶ 23-24.  We further observe, however, that issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.  As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view

> the witnesses and observe their demeanor, gestures and
> voice inflections, and use these observations in
> weighing the credibility of the proffered testimony.

Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well (Emphasis sic)." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). *Accord In re Christian*, 4th Dist. No. 04CA 10, 2004-Ohio-3146, ¶ 7.

{¶35} The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in
> the mind of the trier of fact a firm belief or
> conviction as to the allegations sought to be
> established. It is intermediate, being more than a
> mere preponderance, but not to the extent of such
> certainty as required beyond a reasonable doubt as in
> criminal cases. It does not mean clear and
> unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will

examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-43, 495 N.E.2d 9 (1986). *Cf. In re Adoption of Masa*, 23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence").

**{¶36}** Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 62 (4th Dist.); *In re R.L.*, 2nd Dist. Greene Nos. 2012CA32 and Greene Nos. 2012CA33, 2012-Ohio-6049, ¶ 17,

quoting *In re A.U.*, 2nd Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.'").

**{¶37}** Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" *Id.*, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717; *accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

B

**{¶38}** We recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of

the fundamental liberty interests recognized by th[e United States Supreme] Court.'" *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("natural parents have a fundamental right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157, 556 N.E.2d 1169.

**{¶39}** A parent's rights, however, are not absolute. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). Thus,

the State may terminate parental rights when a child's best interest demands such termination.  *D.A.* at ¶ 11.

**{¶40}** Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing.  The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency.  *Id.*  Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29, 862 N.E.2d 816, quoting R.C. 2151.01(A).

C

**{¶41}** A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody.  In this case, appellee sought permanent custody by filing a motion under

R.C. 2151.413.  When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies.  R.C. 2151.414(A).

{¶42} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶43} Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and

(2) that awarding the children services agency permanent custody would further the child's best interest.

**{¶44}** In the case at bar, appellant does not dispute the trial court's finding that the children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period.  Therefore, we do not address the court's R.C. 2151.414(B)(1)(d) finding.  Appellant does, however, contest the trial court's finding that placing the children in appellee's permanent custody is in their best interests.

**{¶45}** R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody.  The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody

to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

**{¶46}** Courts that are determining whether a grant of permanent custody to a children services agency will promote a child's best interest must consider "all relevant [best interest] factors," as well as the "five enumerated statutory factors."  *C.F.* at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.*, 9th Dist. Summit Nos. 24097 and Summit Nos. 24099, 2008-Ohio-3773, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP-590 and Franklin Nos. 07AP-591, 2008-Ohio-297, ¶ 19.  However, none of the best interest factors are entitled to "greater weight or heightened significance."  *C.F.* at ¶ 57.  Instead, the trial court considers the totality of the circumstances when making its best interest determination.  *In re K.M.S.*, 3rd Dist. Marion Nos. 9-15-37, 9-15-38, and Marion Nos. 9-15-39, 2017-Ohio-142, ¶ 24; *In re A.C.*, 9th Dist. Summit No. 27328, 2014-Ohio-4918, ¶ 46.  In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security."  *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and Lawrence Nos. 15CA19, 2016-Ohio-916, ¶ 66, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

{¶47} In the case sub judice, after our review of the trial court proceeding, we do not believe that the trial court's best-interest determination is against the manifest weight of the evidence.

{¶48} We first note that, although appellant's first assignment of error recites the best-interest factors, she does not explain how any of those factors show that granting permanent custody of the children is not in their best interests. Instead, the best interest argument contained beneath appellant's first assignment of error focuses solely upon her conduct, her case plan compliance, and her current situation. However, the argument contained beneath appellant's second assignment of error does contain a short argument regarding the best-interest factors. Appellant asserts that she and the children share "a clear bond" and that appellant consistently visited the children. Although appellant did not raise her best-interest argument within the corresponding assignment of error, we nonetheless will consider whether the trial court's best interest determination is against the manifest weight of the evidence.

Children's Interactions and Interrelationships

{¶49} The evidence adduced at the hearing reveals that the four children enjoy visiting with one another, generally enjoyed

visiting appellant, and appeared to be bonded with appellant. We hasten to add, however, that the mere existence of a bond is not the sole deciding factor when a court evaluates a child's best interest. *See In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 38 (8th Dist.) (mother's bond with children not weighed more heavily than other statutory best interest factors).

**{¶50}** Furthermore, in April 2021, the trial court terminated appellant's visits with the children due to concerns that the visits were no longer healthy for the children and seemed to cause the children's behavioral issues to worsen. Thus, the evidence indicates that the children do not share a positive, healthy relationship with appellant. Instead, the evidence illustrates that appellant's conduct, and her failure to protect her children, has caused the children to suffer serious emotional trauma.

**{¶51}** Additionally, foster families are providing the children with a healthy environment, along with the support that the children need. S.M. and B.M.'s foster parents would like to adopt the two children. Appellee, however, did not present any clear evidence regarding D.M.'s and J.M.'s foster parents' intentions. The evidence does show that all the foster parents are making admirable and commendable efforts to help these

fragile children improve their behaviors and overall mental health.

### Children's Wishes

{¶52} The court stated that the children's wishes are "outlined within the Guardian Ad Litem report" and noted that the guardian ad litem recommended the court grant appellee permanent custody of the children.

### Custodial History

{¶53} Before their August 2019 removal from the home, the children lived with appellant and their father.  Since their removal, the children have remained in appellee's temporary custody.  When appellee filed its February 2021 permanent custody motion, the children had been in appellee's temporary custody for more than 12 months.

### Legally Secure Permanent Placement

{¶54} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met."  *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal*, 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) ("legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In*

*re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (legally secure permanent placement requires more than stable home and income, but also requires environment that will provide for child's needs); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and father unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56.

{¶55} In the case sub judice, after our review we believe that the evidence adduced at the hearing supports the trial court's finding that the children need a legally secure permanent placement, and they cannot achieve this type of placement without granting appellee permanent custody.  As the court found, appellant ignored the sexual abuse allegations. This court previously recognized that "a parent's doubts regarding a child's abuse allegations raise serious questions about that parent's protective capacities and commitment to providing for the child's emotional needs."  *In re A.M.*, 2018-Ohio-646, 105 N.E.3d 389, ¶ 82 (4th Dist.) (citations omitted); *see also In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 47 (mother's decision to remain living with pedophile-husband supported R.C. 2151.414(E)(14) finding that she is unwilling to prevent children from suffering physical, emotional, or sexual abuse); *In re A.J.*, 6th Dist. Lucas No. L-13-1118, 2014-Ohio-421, ¶ 55 (mother's "continued skepticism about what occurred under her own roof displays a conscious disregard to protect her children and for their well-being"); *In re J.H.*, 12th Dist. Preble No. CA2007-07-016, 2007-Ohio-7079, ¶¶ 30–31 (evidence did not show father prioritized children's safety and unwilling to protect children from future abuse when intended to stay married to wife, the abuser, and when failed to

acknowledge his wife abused the children); *In re Moore*, 7th Dist. Belmont No. 04-BE-9, 2005-Ohio-136, ¶ 40 (upholding permanent custody decision based, in part, upon testimony from sexual abuse investigator that "if a parent does not believe abuse allegation by a child, they would not be capable of protecting that child from future abuse"); *Matter of Ranker*, 11th Dist. Portage Nos. 95-P-0093-0096, 1996 WL 761159, *10 (Dec. 6, 1996) (court may grant permanent custody when mother unable to protect children from a foreseeable abusive situation).

**{¶56}** In the case at bar, appellant did not notify anyone about her suspicions that the father had sexually abused J.M. Appellant did admit that she knew "in her gut that something happened," yet did nothing.  Instead, appellant remained silent because she did not believe that she could raise the children on her own.  Appellant thus failed in one of her essential duties as a parent – to protect her children from abuse.  Consequently, appellant's failure to report her suspicions raises serious doubts about her protective capacity and her ability to provide the children with a safe environment.

**{¶57}** Moreover, all of the children have serious behavioral issues that require counseling.  The stability and routines that the foster homes have given the children allow the children to

begin to recover.  Additionally, once visits with appellant terminated, the foster families noticed significant improvement in the children's behaviors.  Thus, the trial court could have reasonably determined that placing the children in appellee's permanent custody would give the children the best chance of overcoming the emotional trauma that they suffered, and that returning them to appellant – the caregiver who failed to protect them – would cause them to regress.  We cannot fault the trial court for choosing not to experiment with the children's welfare, especially considering their delicate states.  As this court often notes:

> "* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability.  To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * *  The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm."

*In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 48, quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987).

{¶58} Moreover, even if appellant complied with every part of the case plan, as we have observed in the past, a parent's case plan compliance may be a relevant, but not necessarily

conclusive, factor when a court considers a permanent custody motion. *In re B.P.*, 4th Dist. Athens No. 20CA13, 2021-Ohio-3148, ¶ 57; *In re T.J.*, 4th Dist. Highland No. 2016-Ohio-163, ¶ 36, citing *In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 34 ("although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"); *In re S.C.*, 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification"); *accord In re K.M.*, 4th Dist. Ross No. 19CA3677, 2019-Ohio-4252, ¶ 70, citing *In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46 ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency"); *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35 ("substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"). "Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.'" *W.C.J.* at ¶ 46, quoting *In re Gomer*, 3d

Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-1723, ¶ 36; *accord In re K.J.*, 4th Dist. Athens No. 08CA14, 2008-Ohio-5227, ¶ 24 ("when considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus is upon the child's best interests, not upon the parent's compliance with the case plan").  Thus, a parent's case plan compliance will not preclude a trial court from awarding permanent custody to a children services agency when doing so is in the child's best interest. *Id.*

{¶59} In the case sub judice, as we noted above, we believe that the record contains ample clear and convincing evidence that placing the children in appellee's permanent custody is in their best interests.  Although we do not discount appellant's compliance with the case plan, her case plan compliance does not override the children's best interests.

{¶60} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

                                II

{¶61} In her second assignment of error, appellant asserts that the trial court erred by granting appellee permanent custody of the children due to appellee's alleged lack of reasonable efforts to reunify the family.  Appellant contends that appellee should have instead filed for a six-month

temporary custody extension, rather than a permanent custody request.

**{¶62}** We note, however, that the argument that appears beneath appellant's second assignment of error does not assert that appellee failed to use reasonable efforts.  Instead, within her second assignment of error appellant contends that the trial court's best-interest determination is against the manifest weight of the evidence.  Because appellant does not raise any specific argument regarding appellee's alleged failure to use reasonable efforts, we will not construct this argument for her. *See generally State v. Dailey*, 4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶ 43-44, quoting *State v. Palmer*, 9th Dist. Summit No. 28303, 2017-Ohio-2639, ¶ 33 (appellate court does not have a duty to construct argument on an appellant's behalf and stating that this court will not address "'undeveloped arguments'").  We further note that R.C. 2151.419(A)(1) does require a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."  However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused,

neglected, or dependent children * * *." *C.F., supra*, at ¶ 41; *accord In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 72. Thus, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30. Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶ 42. Instead, at prior "stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* Additionally, "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶63} In the case sub judice, appellant's appeal does not originate from one of the types of hearings specifically listed in R.C. 2151.419(A): "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." Appellee, therefore, did not have the burden to prove at the permanent custody hearing that it used reasonable efforts to reunify the family,

unless it had not previously done so.  Here, our review of the record reflects that the trial court made reasonable efforts findings before the agency filed its permanent custody motion. Thus, the court did not need to again find that the agency used reasonable efforts before it could grant the agency permanent custody of the children.  *E.g., In re M.H.-L.T.*, 4th Dist. Washington No. 17CA12, 2017-Ohio-7825, ¶ 64; *In re S.S.*, 4th Dist. Jackson Nos. 16CA7 and 16CA8, 2017-Ohio-2938, ¶ 168.

{¶64} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.